144 F.3d 229
 1998 Copr.L.Dec. P 27,783, 46 U.S.P.Q.2d 1760
 Richard E. GRAHAM, dba Night Owl Computer Service and Night
Owl Publisher, Inc., Plaintiff-Appellant-Cross-Appellee,
v.
Larry D. JAMES, Defendant-Appellee-Cross-Appellant.
 Nos. 794, 795 and 796, Dockets 96-9224, 96-9272 and 97-7706.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 9, 1998.
Decided May 18, 1998.
 
 Denis A. Kitchen, Jr., Williamsville, NY, for Plaintiff-Appellant-Cross-Appellee.
 James Ostrowski, Buffalo, NY, for Defendant-Appellee-Cross-Appellant.
 Before: WALKER and JACOBS, Circuit Judges, and MISHLER*, Senior District Judge.
 JACOBS, Circuit Judge.
 Plaintiff Richard E. Graham (dba Night Owl Computer Service and then through a corporate entity, Night Owl's Publisher, Inc.[1] ) marketed CD-ROM disks containing compilations of computer programs; defendant Larry D. James created file-retrieval programs that allowed users to access particular programs on Graham's products or (presumably) other CD-ROM disks. In this case, the parties assert conflicting rights to James's work product.
 Graham now appeals, and James cross-appeals, from a judgment of the United States District Court for the Western District of New York (Elfvin, J.), following a bench trial, awarding James $137,258 in damages on his copyright infringement and breach of contract counterclaims.
 
 
 1
 On appeal, Graham claims principally that the district court erred: (i) in finding that the program was not a work for hire developed while James was in Graham's employ and therefore that James owned the copyright for the CD-ROM file-retrieval program; and (ii) in finding copyright infringement even though James granted Graham a license to use the program. James cross-appeals, claiming that the district court erred: (i) in failing to award pre-judgment interest; (ii) in dismissing James's defamation action based on the common interest privilege; (iii) in failing to enter judgment against Night Owl's Publisher, Inc., the alleged successor to Graham's sole proprietorship; and (iv) in denying James's request for a continuance to obtain expert testimony.
 
 
 2
 We affirm the district court's finding that the file-retrieval program was not a work for hire and its award of breach of contract damages (as well as its denial of pre-judgment interest thereon). We also affirm the district court's dismissal of James's defamation counterclaim. However, we vacate the judgment and remand to permit the district court to determine whether Graham's license to use the file-retrieval program was rescinded, and thus whether Graham infringed James's copyright. On remand, the district court should reconsider whether judgment should be entered against Graham's successor, Night Owl's Publisher, Inc.
 
 BACKGROUND
 
 3
 The facts, as found by the district court after a bench trial, are as follows: Graham, until recently doing business as Night Owl Computer Service, markets CD-ROM disks containing compilations of computer programs known as "Shareware," "Freeware," and "Public Domain software." "Shareware" are programs that are created and released to the public to sample, with the understanding that anyone using the software will register with the author and remit a fee. "Freeware" is software available for free use. "Public Domain software" is software unprotected by copyright. Each of Graham's CD-ROM disk releases contains 5,000 to 10,000 such programs.
 
 
 4
 Graham's first CD-ROM disk release, called PDSI-001, was unwieldy because it lacked a file-retrieval program. So before releasing his second CD-ROM product, Graham asked Jeffrey Anderson, a student, to compose a file-retrieval program. Anderson developed a program called NIGHT.EXE in the QuickBASIC programming language; that program was then incorporated into Graham's second CD-ROM disk release, PDSI-002. Anderson's program provided a table of contents for the programs on the disk, but did not allow for actual file retrieval, or for decompression of the files. Because of the number of programs on each disk, the programs had to be compressed prior to placement on the disk and thus decompression was necessary prior to using a program. Although Graham claimed to have participated in the development of NIGHT.EXE, he is not a computer programmer and the trial court found that his role in the program's development was "negligible."
 
 
 5
 Dissatisfied with Anderson's program, Graham purchased a license for FOLIO, a file-retrieval program with retrieval and decompression capabilities, that Graham used for his next two releases.
 
 
 6
 In March 1991, he contacted James, a self-taught computer programmer, part-time taxi driver, and computer equipment salesman, and explained to him in general terms what was needed. James agreed to create a file-retrieval program in exchange for a CD-ROM disk drive and credit on the final product. He then created a different QuickBASIC version of NIGHT.EXE, which was included on PDSI-004; unlike Anderson's program, James's had retrieval and decompression capabilities. Neither party asserts any claim relating to this version of NIGHT.EXE.
 
 
 7
 Using "Borland's C++" language (said to be a superior programming language), James then developed a new version of NIGHT.EXE, which we will call the "C version." The C version was included in PDSI-004-1, released on August 2, 1991. This was an entirely new program, and Graham's contribution was limited to communicating the general requirements of the program and collaborating on the organization of the files that the program retrieved.
 
 
 8
 In composing the C version, James built into it a notice attributing authorship and copyright to himself. In September 1991, Graham and James argued over the copyright notice, with Graham claiming the copyright under the work-for-hire doctrine. At trial, Graham introduced a tape recording of a late-night telephone conversation between himself and James, in which they argued over copyright ownership and their compensation arrangement; the conversation ended without any resolution.
 
 
 9
 At trial, the parties presented conflicting testimony regarding their compensation and licensing arrangement. Graham claimed that he made several payments to James for developing the C version, including $200 payments in July and August 1991, and three $250 payments in September 1991; Graham claimed that the last three payments were pursuant to a newly-instituted "monthly" salary. James claimed that Graham orally agreed to a licensing arrangement under which Graham would pay James $1,000 for each CD-ROM release containing the program and $1 for each disk sold, that the five payments evidenced Graham's partial performance of the licensing agreement, and that Graham promised further payments pursuant to the agreement after he built up his cash reserve. The district court found that "the parties had orally agreed that James would provide Graham with a file retrieval program written in Borland's C++" and "that Graham would pay James $1,000 for each version provided thereof and one dollar for each disk sold."After the late-night telephone conversation, Graham removed James's copyright notice, repaired a "bug" in the program, and proceeded to release a new version of PDSI-004-1. In October 1991, Graham released PDSI-005. PDSI-006, PDSI-006-1 and PDSI006-2 followed in early- to mid-1992, and NOPV-6 in the summer of 1992. All of these releases contained the C version of NIGHT.EXE (or a slight modification of it).
 
 
 10
 Variants of the C version were used in NOPV 7,8 and 9; but Graham alleged that these variants were created by other programmers, and the district court concluded that these later programs were not substantially similar to James's C version.
 
 
 11
 In September or October 1991, James sold the C version of NIGHT.EXE to another CD-ROM publisher. Graham sued and moved for a preliminary injunction, claiming ownership of the copyright in the C version under the work-for-hire doctrine and asserting that James had infringed Graham's copyright by selling the program. James counterclaimed, alleging that he owned the copyright and that Graham had infringed his copyright by installing the C version on his CD-ROM releases and removing James's copyright notice. James also asserted counterclaims for breach of the licensing agreement, unfair competition, defamation, and tortious interference with contractual relations. The district court granted a preliminary injunction enjoining James from "publishing, copying, selling, marketing or otherwise disposing" of programs substantially similar to the C version.
 
 
 12
 After a bench trial, however, the district court found for James on his breach of contract and copyright infringement counterclaims. It concluded that James owned the C version copyright because he was an independent contractor when he developed the program, and that Graham's CD-ROM releases from PDSI-004-1 through NOPV-6 contained file-retrieval programs substantially similar to the C version, thereby infringing James's copyright. The court also rejected Graham's copyright infringement claim, permanently enjoined Graham from using the program, and dismissed James's common law counterclaims. On James's contract counterclaim, the court found that Graham had breached the agreement by failing to pay James $1,000 for each release containing the C version and one dollar for each disk sold.
 
 
 13
 Damages were awarded as follows: (i) actual damages for breach of contract of $17,716, representing six CD-ROM releases at $1000 per release, and 12,866 disks at $1 per disk, for a total of $18,866, minus the $1,150 already paid to James; and (ii) actual damages and profits for copyright infringement of $119,542, representing: (a) $25,000 for Graham's failure to credit James with authorship; and (b) $112,258 of profits and actual damages on the six relevant CD-ROM releases, reduced by $17,716 (the amount awarded for breach of contract to avoid double counting).
 
 
 14
 Later, the court denied James's motion pursuant to Fed.R.Civ.P. 59 to amend the judgment to add Graham's successor corporation, Night Owl's Publisher, Inc. as a judgment debtor, and James's motion pursuant to Fed.R.Civ.P. 60 to amend the judgment to include pre-judgment interest.
 
 DISCUSSION
 
 15
 * Graham challenges the finding--on which rests the conclusion that the C version was not a work for hire--that James developed the C version as an independent contractor rather than as an employee. We agree with the district court's analysis and conclusion.
 
 
 16
 The Copyright Act provides, inter alia, that "a work prepared by an employee within the scope of his or her employment" is a work for hire. 17 U.S.C. § 101 (1994). "[T]he employer or other person for whom the work [for hire] was prepared is considered the author" and the employer owns the copyright, absent a written agreement to the contrary. 17 U.S.C. § 201(b).
 
 
 17
 For this purpose, "the term 'employee' should be understood in light of the general common law of agency." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 741, 109 S.Ct. 2166, 2173, 104 L.Ed.2d 811 (1989). The Supreme Court in Reid listed factors to be considered in the inquiry, none of which are dispositive:
 
 
 18
 In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.
 
 
 19
 Id. at 751, 109 S.Ct. at 2178-79 (citations omitted).
 
 
 20
 "The court's factual findings as to the presence or absence of the Reid factors cannot be disturbed unless clearly erroneous .... [but] the ultimate determination of whether [the allegedly infringing product] was a work for hire is reviewed de novo." Aymes v. Bonelli, 980 F.2d 857, 860-61 (2d Cir.1992). We give greater weight to certain of the Reid factors: (i) the hiring party's right to control the manner and means of creation; (ii) the skill required; (iii) the provision of employee benefits; (iv) the tax treatment of the hired party; and (v) whether the hiring party had the right to assign additional projects to the hired party. Aymes, 980 F.2d at 861. So in Aymes, although a business directed the creation of the computer program to maintain its financial and inventory records, the program was held not to be a work for hire, because--among other factors--the nonpayment of benefits or payroll taxes to or on behalf of the creator supported the conclusion that the creator was an independent contractor rather than an employee. Id. at 864.
 
 
 21
 We are persuaded by the district court's conclusion that James was an independent contractor. Almost all of the Aymes factors line up in favor of that conclusion: James is a skilled computer programmer, he was paid no benefits, no payroll taxes were withheld, and his engagement by Graham was project-by-project. The only Aymes factor arguably favoring Graham is his general control over the work; but the district court has found, plausibly, that Graham's participation in the development of the C version was minimal and that his instructions to James were very general. We affirm the district court's determination that the C version was not a work for hire, and that consequently James owns the copyright.
 
 II
 
 22
 Graham claims that even if James owns the copyright in the C version, Graham was licensed to use the copyright under a licensing agreement, and that the district court therefore erred in finding that Graham was an infringer. According to Graham, James was entitled at most to recover for Graham's breach of the licensing agreement.
 
 
 23
 Under federal law, "nonexclusive licenses may ... be granted orally, or may even be implied from conduct." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A], at 10-43; see also I.A.E., Inc. v. Shaver, 74 F.3d 768, 775-76 (7th Cir.1996). The district court found that Graham and James had entered into a licensing agreement under which Graham promised to pay James $1,000 for each CD-ROM release containing the C version and one dollar for each disk sold. Graham does not contest on appeal that he breached this agreement by failing to make the required payments, and therefore we affirm the district court's award of breach of contract damages.[2]
 
 
 24
 However, the award of copyright damages in this case is problematic. A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement. See Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 753 (11th Cir.1997); Peer Int'l Corp. v. Pausa Records, Inc., 909 F.2d 1332, 1338-39 (9th Cir.1990); see also United States Naval Inst. v. Charter Communications, Inc., 936 F.2d 692, 695 (2d Cir.1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it."). Moreover, Graham's failure to credit James with the copyright on the C version did not itself amount to copyright infringement. According to Nimmer, "The generally prevailing view in this country under copyright law has been that an author who sells or licenses her work does not have an inherent right to be credited as author of the work. In line with that general rule, it has been held not to infringe an author's copyright for one who is licensed to reproduce the work to omit the author's name." 3 Nimmer on Copyright, supra, § 8D.03[A], at 8D-32 (citations omitted). Thus, as James concedes, the district court could not have found that Graham infringed James's copyright unless the licensing agreement already had been rescinded; the problem is that the district court made no such finding. James endeavors to overcome that problem in four ways, but without success.
 
 
 25
 First, James argues that Graham failed to plead the license as an affirmative defense to infringement, and thereby waived it. See Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir.1995) (noting that burden of proving existence of license is on licensee), cert. denied, 517 U.S. 1240, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). But the existence of a license was essentially uncontested in this case. James affirmatively alleged in his answer and counterclaim (in support of his breach of contract action) that "[o]n or about May 1991, defendant orally agreed to grant plaintiff the right to use his computer program on CD-ROM disks in exchange for a fee of $1,000 for each CD-ROM version issued and a $1.00 fee for each copy of such version sold by plaintiff." What is disputed here is the scope of the license and how long the license lasted. As we said in Bourne, when the contested issue is the scope of a license, rather than the existence of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized under the license and the license need not be pleaded as an affirmative defense. Id. So the burden was on James as the copyright owner to show that the allegedly infringing acts were not allowed by the license; Graham's reply pleading did not amount to a waiver of his present position.
 
 
 26
 Second, James argues that Graham's license permitted use of the C version only on the PDSI-004-1 CD-ROM, and not on any subsequent release. The short answer is that the district court implicitly found otherwise in awarding James breach of contract damages on all six CD-ROM releases which used the C version, because the contract Graham breached was the license.
 
 
 27
 Third, James argues that the license was voided when Graham breached its conditions by nonpayment of royalties and removal of James's copyright notice. This argument turns--and fails--on the distinction in contract between a condition and a covenant. Generally, "[i]f the [licensee's] improper conduct constitutes a breach of a covenant undertaken by the [licensee] ... and if such covenant constitutes an enforcible contractual obligation, then the [licensor] will have a cause of action for breach of contract," not copyright infringement. 3 Nimmer on Copyright, supra, § 10.15[A], at 10-120. However, "[i]f the nature of a licensee's violation consists of a failure to satisfy a condition to the license ..., it follows that the rights dependant upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright." Id. at 10-121 (citations omitted); see also Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., 661 F.2d 479, 483-84 (5th Cir.1981). A condition has been defined as "any fact or event which qualifies a duty to perform." Costello Publ'g Co. v. Rotelle, 670 F.2d 1035, 1045 n. 15 (D.C.Cir.1981) (citing Corbin, Conditions in the Law of Contract, 28 Yale L.J. 739 (1919)).
 
 
 28
 We think that the payment of royalties and the inclusion of a notice crediting James's authorship are to be considered covenants, not conditions. The construction of the licensing agreement is governed by New York law. See Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 153 (2d Cir.1968). Generally speaking, New York respects a presumption that terms of a contract are covenants rather than conditions. See Grand Union Co. v. Cord Meyer Dev. Co., 761 F.2d 141, 147 (2d Cir.1985) ("In the absence of more compelling evidence that the parties intended to create a condition, the negotiation provision must be construed as a promise or covenant."); Warth v. Greif, 121 A.D. 434, 106 N.Y.S. 163, 165 (2d Dep't 1907) ("The law favors covenants, rather than conditions precedent."), aff'd, 193 N.Y. 661, 87 N.E. 1129 (1908). Graham and James orally agreed to the licensing agreement and did not clearly delineate its conditions and covenants. Further, it is important that James turned over the C version for use before any royalties were paid, and that the first version of PDSI-004-1 was published with the proper notice of authorship, because contract obligations that are to be performed after partial performance by the other party are not treated as conditions. 22 N.Y. Jur.2d Contracts § 265 (1996); see also Jacob Maxwell, Inc., 110 F.3d at 754 (holding that payment of royalties and crediting of author were covenants because "[the composer] expressly granted [the licensee] permission to play the song before payment was tendered or recognition received"); I.A.E., Inc., 74 F.3d at 778 (holding that full payment was not a condition precedent when the licensee received the copyrighted drawings after tendering only half the required payment).
 
 
 29
 Guided by that analysis, together with New York's presumption favoring covenants over conditions and the district court's clear finding that a licensing agreement came into existence, we conclude that the notice and royalty obligations would likely be considered covenants, and cannot be relied upon by James as conditions.
 
 
 30
 Finally, James argues that even if the nonpayment of royalties and the removal of James's authorship credit amount to no more than breaches of covenants, these breaches terminated the license. A material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter. See Rano v. Sipa Press, Inc., 987 F.2d 580, 586 (9th Cir.1993) ("[A] material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement."); Costello Publ'g Co., 670 F.2d at 1045 ("[E]ven if the counterclaims asserted merely constitute a breach of contract, an action for copyright infringement would lie if the breach is so material that it allows the grantor power to recapture the rights granted so that any further use of the work was without authority."); 3 Nimmer on Copyright, supra, § 10.15[A], at 10-123-10-125; see also Lulirama Ltd. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 882-83 (5th Cir.1997) (holding that non-exclusive license is not revocable at will of licensor). Under New York law, rescission is permitted if the breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Septembertide Publ'g, B.V. v. Stein and Day, Inc., 884 F.2d 675, 678 (2d Cir.1989) (internal quotation marks and citation omitted).
 
 
 31
 Even assuming Graham materially breached the licensing agreement and that James was entitled to rescission, such rescission did not occur automatically without some affirmative steps on James's part. 22A N.Y. Jur.2d Contracts § 497 (1996) ("The failure of a party to perform his part of a contract does not per se rescind it. The other party must manifest his intention to rescind within a reasonable time."); see also Jacob Maxwell, Inc., 110 F.3d at 753 ("Such a breach would do no more than entitle [the composer] to rescind the agreement and revoke its permission to play the song in the future, actions [the composer] did not take during the relevant period. One party's breach does not automatically cause [rescission] of a bilateral contract.") (emphasis omitted). Similarly, although James sometimes characterizes the licensing agreement as abandoned, abandonment of a contract can be accomplished only through mutual assent of the parties, as demonstrated by positive and unequivocal conduct inconsistent with an intent to be bound. See Armour & Co. v. Celic, 294 F.2d 432, 435-36 (2d Cir.1961). New York law does not presume the rescission or abandonment of a contract and the party asserting rescission or abandonment has the burden of proving it. See id. at 436.
 
 
 32
 We vacate the copyright infringement award because: (i) the record does not show that James was permitted to and did rescind the license or that Graham and James agreed to abandon the licensing agreement[3]; (ii) the district court made no finding on this issue; and (iii) it does not appear that the district court recognized this defect in its decision. We remand for determinations as to whether Graham materially breached the licensing agreement and whether the agreement was actually rescinded or abandoned prior to the allegedly infringing acts,[4] and for any further proceedings needed to make those determinations.
 
 
 33
 Even though we remand to the district court to resolve this factual issue, we think it useful to decide the other issues raised by the parties.
 
 III
 
 34
 Graham argues that the district court insufficiently justified the $25,000 damages award for Graham's omission of a notice of James's authorship. There is authority for awarding such damages. See Stodart v. Mutual Film Corp., 249 F. 507, 511 (S.D.N.Y.1917) (L.Hand, J.), aff'd, 249 F. 513 (2d Cir.1918); 4 Nimmer on Copyright, supra, § 14.02[B], at 14-19 (noting that "the plaintiff may be able to recover certain additional items of actual damages .... [including] loss of the value of being credited as the author of the work"); see also Sunset Lamp Corp. v. Alsy Corp., 749 F.Supp. 520, 524-25 (S.D.N.Y.1990) (permitting award of actual damages for loss of sales of non-infringed products resulting from infringement of product which plaintiff considered "door opener" to market if plaintiff demonstrated causal connection). But if the owner of a copyright may win an infringement award representing lost opportunity, the amount of actual damages must be based on more than speculation. See Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 407 (2d Cir.1989) ("Where there is no evidence at all allowing an assessment of the value of ["enhanced good will" or "market recognition"], establishment of the fact of enhancement will not support an award."); Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir.1985).
 
 
 35
 The district court noted that the $25,000 award was "uncontested," and cited no record evidence to support it. But Graham clearly opposed this award of damages, even if he did not address the amount specifically. And James candidly conceded at oral argument that, as far as counsel could tell, the $25,000 amount was arbitrary. In the absence of any stated basis for this award, we must vacate it. However, because we remand on other grounds, we do not foreclose the possibility that this kind of damages, or even this amount, may be supported on remand by evidence of nonspeculative damages traceable to Graham's failure to credit James's authorship. Alternatively (given sufficient proof), the same loss might be recompensed as breach of contract damages if the failure to credit James's authorship amounted to a breach of the licensing agreement.
 
 IV
 
 36
 James cross-appeals on several grounds.
 
 
 37
 First, James argues that the district court erred in failing to award him pre-judgment interest on his contract and copyright damages. James failed to request pre-judgment interest prior to entry of judgment, and first moved for that relief in his motion to amend the judgment pursuant to Fed.R.Civ.P. 60, which the district court denied.
 
 
 38
 Under New York law, "prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract." Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir.1984); see N.Y. C.P.L.R. § 5001 (McKinney 1992). However, relying on Paddington Partners v. Bouchard, 34 F.3d 1132, 1142-44 (2d Cir.1994), the district court properly denied the post-judgment motion for an award of pre-judgment interest pursuant to Rule 60(a), and did not abuse its discretion in denying such relief pursuant to Rule 60(b). Further, although Paddington noted that "a district court may add pre-decision interest to a judgment when the question of damages is reversed on appeal and the entire question of damages is remanded for reconsideration or recalculation," id. at 1144, this exception does not apply here because we have affirmed the damage award on the contract claim, and the parties' expectation of finality relating to this award has not been disturbed. Cf. Adams, 730 F.2d at 93 (permitting district court award of pre-judgment interest on contract damages on remand for redetermination of contract damage award); Newburger, Loeb & Co. v. Gross, 611 F.2d 423, 432-33 (2d Cir.1979) (upholding district court's sua sponte award of pre-judgment interest on damages on remand for redetermination of several aspects of that damages award).[5]
 
 
 39
 Second, as to the defamation counterclaim, James argues that Graham waived his defense under the common interest privilege by failing to plead it in his reply. However, James's counterclaim failed to identify the persons to whom Graham had made the allegedly libelous statements, so it cannot be deemed that Graham was aware at the time of his reply that he shared a common interest with them. Once the allegations became more focused, Graham timely asserted this privilege, albeit in his post-trial brief. We therefore affirm the district court's dismissal of James's defamation counterclaim.
 
 
 40
 Third, James argues that the district court erred in denying his Rule 59 motion to amend the judgment to hold Night Owl's Publisher, Inc. ("Owl's Inc.") liable for the award. During the trial, James moved orally to amend his complaint to add Owl's Inc. as a plaintiff. In its findings of fact and law, the district court granted this motion, finding that "Graham was an individual doing business under an assumed name and has, since the commencement of this action, incorporated such business as Night Owl's Publisher, Inc., a New York Subchapter S corporation," that Graham was the sole officer, director and shareholder of the corporation, and that "Night Owl's has stepped into the shoes of Graham's former sole proprietorship." But the district court's final judgment does not list Owl's Inc. as a judgment debtor.
 
 
 41
 Following the trial, James made a timely motion pursuant to Rule 59(e) to amend the judgment to include Owl's Inc. as a judgment debtor. The district court denied the motion, having found no evidence that Graham was trying to evade the judgment by transferring assets to Owl's Inc., and noting that James could just as well seize Graham's ownership interest in Owl's Inc. to enforce the judgment against Graham.
 
 
 42
 There does seem to be no evidence that Graham was attempting to evade the judgment through Owl's Inc., but the district court failed to consider the other theory of successor liability proposed by James: the "mere continuation" theory. Under both New York state and federal law, the general rule is that a corporation that acquires the assets of another corporation is not liable for the torts of its predecessor. See B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir.1996); Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 244-45, 464 N.Y.S.2d 437, 440, 451 N.E.2d 195 (1983). An exception arises when, inter alia, the "purchasing corporation was a mere continuation of the selling corporation." Id.; see also B.F. Goodrich, 99 F.3d at 519. Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates "the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." B.F. Goodrich, 99 F.3d at 519; see also Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F.Supp. 834, 839 (S.D.N.Y.1977) (holding that "mere continuation" exception applies when there is "something in the nature of a corporate reorganization, rather than a mere sale"). "The traditional rule of corporate successor liability and the exceptions to the rule are generally applied regardless of whether the predecessor or successor organization was a corporation or some other form of business organization." 63 Am.Jur.2d Products Liability § 117 (1984).
 
 
 43
 On remand, the district court should consider the applicability of the mere continuation theory, especially in light of the district court's finding that Graham is the sole officer, director and shareholder of the corporation, and in light of Graham's testimony that he transferred all of his business assets from his sole proprietorship to Owl's Inc., including the customer lists, stock, and machinery. Fourth, James argues that the district court abused its discretion in preventing him from reopening the evidentiary record to view the source code of the file-retrieval programs used on NOPV-7, 8 & 9, and to present evidence of substantial similarity to the C version. We see no abuse of discretion: (i) James presented no credible evidence of substantial similarity between the C version and the file-retrieval program on these later CD-ROM releases; (ii) the court's own comparison found a lack of the same obvious similarity found in the file-retrieval programs on the earlier CD-ROM releases; (iii) Graham's expert testified that the two programs were not substantially similar; and (iv) James made no commitment to retain an expert to make the necessary comparison.
 
 CONCLUSION
 
 44
 We affirm the district court's finding that the file-retrieval program was not a work for hire and its award of breach of contract damages (as well as its denial of pre-judgment interest thereon). We also affirm the district court's dismissal of James's defamation counterclaim. However, we vacate the judgment and remand to permit the district court to determine whether Graham's license to use the file-retrieval program was rescinded, and the related question of whether Graham infringed James's copyright. On remand, the district court should reconsider whether judgment should be entered against Graham's successor, Night Owl's Publisher, Inc.
 
 
 
 *
 Honorable Jacob Mishler, of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 Although the parties sometimes refer to the corporation as "Night Owl Publisher, Inc.," we will use the district court's designation of the corporation, i.e., "Night Owl's Publisher, Inc."
 
 
 [2]
 It is undisputed that the final copy of the C version contained a "bug." Graham argues, for that reason, that the district court erred in finding that James had fully performed his contract obligations. However, the district court credited James's testimony to the effect "that the program with this bug was not intended to be the version released to the public, but a working 'Beta' copy and that, hence, [James's] performance under the contract should not be deemed partial or incomplete." The conclusion that James fully performed his obligations under the contract was not clearly erroneous
 Graham also challenges the finding that he is contractually bound to pay $1,000 for each CD-ROM release; he claims that the deal was $1,000 for each new version of the C version produced by James, and that James never produced another version. The district court did not clearly err in rejecting this argument: James testified that he was to receive $1,000 for, as he phrased it, "each initial cut," and James set up a subsequent arrangement for the sale of the C version to another CD-ROM publisher which provided for payment of $1,000 per CD-ROM release.
 
 
 [3]
 James points to several actions by Graham that he claims terminated the contract, including that "Graham swore at James after James refused to remove his copyright notice," and that Graham commenced a lawsuit against James asserting copyright infringement. However, it is unclear from the record whether James, the non-breaching party, gave notice of rescission or abandoned the licensing agreement. In fact, when James asserted his counterclaims, he asserted a breach of contract claim arising from the licensing agreement, without alleging that he had rescinded or terminated the agreement. Moreover, although the district court referenced the September 24, 1991 "termination of the parties' relationship," it is not clear whether this included a rescission of the licensing agreement as well, or merely involved a termination of their personal relationship
 
 
 [4]
 We note that even if the district court finds that the licensing agreement was terminated in September 1991, the contract damages representing subsequent releases and disk sales may still stand because Graham has not contested those damages on appeal and because the contract damages represent James' expectation damages--i.e., the amount he would have been paid had the contract not been breached. Of course, as the district court realized, any contract damages representing actual copyright damages would have to be subtracted from the final copyright award to avoid double recovery
 
 
 [5]
 Although James also seeks prejudgment interest on his copyright infringement damages, that issue is not ripe since it is unclear whether James is entitled to any copyright damages