LORETTA A. PRESKA, Senior United States District Judge
Plaintiff Muench Photography, Inc. ("Plaintiff") filed this action for breach of *84 contract and copyright infringement against Defendants McGraw-Hill Global Education Holdings, LLC and McGraw-Hill School Education Holdings, LLC ("Defendants" or "McGraw-Hill"). The parties signed an agreement stipulating to the dismissal of Plaintiff's breach of contract claims [dkt. no. 109-2]. Before the Court are the parties' Proposed Findings of Fact and Conclusions of Law with respect to the outstanding copyright infringement claims. (Defendants' Proposed Findings Of Fact And Conclusions Of Law ("Def. Br."), dated Sep. 12, 2018 [dkt. no. 105]; Plaintiff's Response To Defendants' Proposed Findings Of Fact And Conclusions Of Law And Plaintiff's Proposed Findings Of Fact And Conclusions Of Law ("Pl. Br."), dated Sep. 21, 2018 [dkt. no. 108] ).
The Court has previously informed the parties that it will construe these papers as motions for summary judgment on Plaintiff's copyright claims under Federal Rule of Civil Procedure 56. For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's motion is denied.
I. Background
McGraw-Hill is a publisher of textbooks and educational products for pre-kindergarten through college and post-graduate courses. (Def. Br. at 1). Plaintiff is a California-based stock photography agency that licenses photographs created by professional photographers David Muench and Marc Muench. (Pl. Br. at 21). Plaintiff entered into a stock photo representation agreement with Corbis, a stock photo agency, authorizing Corbis to license Muench's photographs to others, including publishers like McGraw-Hill. (Def. Br. at 1).
Corbis (and The Stock Market ("TSM") before it) and McGraw-Hill entered into several written agreements, including:
a. An agreement entitled "McGraw-Hill Higher Education Volume Pricing Agreement (Dubuque and Burr Ridge)," dated November 20, 2000 (the "2000 Higher Ed Rate Card"), which established the license fees and conditions between McGraw-Hill's Higher Education division and Corbis, as of at least November 20, 2000. Appendix in Support of MHE's Pre-Motion Conference on Motion for Summary Judgment ("Def. Appendix"), dated Aug. 21, 2018 [dkt. no. 104-4], Ex. 4, (Roerig-Blong Decl.) ¶ 5; id., Ex. A;
b. An agreement entitled "Textbook rates Glencoe valid through 5-1-2001," which established the license fees and conditions between McGraw-Hill's School Group division and TSM, as of at least June 29, 2000. Def. Appendix, Ex. 3 (Norton Decl.) ¶ 4; id., Ex.
c. An agreement entitled "Special Volume-Based Pricing Agreement," effective January 1, 2003 (the "2003 PPA"), which established the license fees and conditions between McGraw-Hill and Corbis as of January 1, 2003. Def. Appendix, Ex. 2 (Spelman Decl.), Ex. A; Ex. 3 (Norton Decl.) ¶ 5; Ex. 4 (Roerig-Blong Decl.) ¶ 7;
d. An agreement entitled "Special Volume-Based Pricing Agreement," effective May 1, 2006 (the "2006 PPA"), which established the license fees and conditions between McGraw-Hill and Corbis as of May 1, 2006. Def. Appendix, Ex. 1 (Beacher Decl.), Ex. B; Ex. 2 (Spelman Decl.) ¶ 5; Ex. 3 (Norton Decl.) ¶ 6; Ex. 4 (Roerig-Blong Decl.) ¶ 8;
*85 e. An agreement entitled "Preferred Pricing Agreement" effective February 27, 2009 ("2009 PPA"), which established the license fees and conditions between McGraw-Hill and Corbis as of February 27, 2009. Def. Appendix, Ex. 1 (Beacher Decl.), Ex. C; Ex. 2 (Spelman Decl.), Exs. B, C, D; Ex. 3 (Norton Decl.) ¶ 7; Ex. 4 (Roerig-Blong Decl.) ¶ 9; and
f. An agreement entitled "Preferred Pricing Agreement" effective April 1, 2014 ("2014 PPA"), which established the license fees and conditions between McGraw-Hill and Corbis as of April 1, 2014. Def. Appendix, Ex. 2 (Spelman Decl.), Ex. E; Ex. 3 (Norton Decl.) ¶ 8; Ex. 4 (Roerig-Blong Decl.) ¶ 10. (Def. Br. at 3-5).
Limits on the licenses that Corbis issued to McGraw-Hill are stated in the Corbis Corporation Invoice and License Agreements. (Plaintiff's Appendix ("Pl. Appendix"), dated Sep. 21, 2018 [dkt. no. 107], Ex. 3).
Between 2001 and 2009, Corbis issued one-time, limited licenses to McGraw for use of Muench's photographs in McGraw publications. (Pl. Br. at 23). Under the relationship between McGraw-Hill and Corbis (and The Stock Market as a predecessor entity in interest), McGraw-Hill obtained thousands of photos, including Muench's photos, for use in its educational textbook programs. Throughout this relationship, Corbis provided, or allowed, unrestricted access to transparencies or high-resolution files of photos as part of McGraw-Hill's editorial process to incorporate those photos in the textbook programs. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 8; Ex. 3 (Norton Decl.) ¶¶ 10-12; Ex. 4 (Roerig-Blong Decl.) ¶¶ 12-14. (Def. Br. at 5).
Consistent with its relationship with Corbis, and with the textbook industry's custom and practice, McGraw-Hill understood that it obtained permission to use photos when it received the photos from the agency, either in transparency or digital format or, later in the 2000s, through direct access from the Corbis website. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 7-8; Ex. 3 (Norton Decl.) St 15; Ex. 4 (Roerig-Blong Decl.) ¶ 17. (Def. Br. at 5).
Once McGraw-Hill decided to use a photo from Corbis's collection, it sent a request for invoicing to Corbis, providing information about McGraw-Hill's anticipated use of the photos, typically including the anticipated print run, geographic distribution, language(s), and format(s) of the textbook that would likely contain the selected photo. Def. Appendix, Ex. 2 (Spelman Decl. 13 7-9); Ex.3 (Norton Decl.) ¶ 19; Ex. 4 (Roerig-Blong Decl.) ¶ 17. (Def. Br. at 5).
McGraw-Hill asserts that its invoice requests typically assumed that permission already existed for use of the specified photos because these photos had already been obtained from the agency and because the parties already had pricing agreements to cover the anticipated use of the photos. Def. Appendix, Ex. 2 (Spelman Decl. ¶¶ 7-9); Ex. 3, (Norton Decl.) ¶ 18; (Roerig-Blong Decl.) ¶ 20. McGraw-Hill's invoice request documents merely requested that the agency issue an invoice pursuant to the pricing parameters established in the parties' pricing agreements. (Def. Br. at 6).
In response to McGraw-Hill's invoice requests, Corbis would send invoices indicating the price to be paid by McGraw-Hill for the anticipated use. Def. Appendix, Ex. 2 (Spelman Decl.) St 8; Ex. 3 (Norton Decl.) ¶ 19; Ex. 4 (Roerig-Blong Decl.) ¶ 21. (Def. Br. at 6).
McGraw-Hill typically sent invoice requests to Corbis prior to publication; however *86 sometimes the invoice requests were sent after the initial publication. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 14-15; Ex. 3 (Norton Decl.) ¶ 20; Ex. 4 (Roerig-Blong Decl.) ¶ 22. (Def. Br. at 6). In such instances, McGraw-Hill asserts that Corbis would issue "back-dated" invoices (i.e., acknowledging rights beginning prior to the invoice date). Id.
McGraw-Hill did not understand the Corbis invoices to impose limits on its permission to use the specified photos, but rather to indicate the amount of use McGraw-Hill anticipated it would make and the amount of money to be paid for that anticipated use. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 9-10, 14; Ex. 3 (Norton Decl.) ¶ 21; Ex. 4 (Roerig-Blong Decl.) ¶ 23.
If McGraw-Hill exceeded the usage it had paid for to Corbis, it understood that it should make an additional payment, but that McGraw-Hill's additional use of the photo was not barred - both under the PPAs and under the parties' understanding, by McGraw-Hill's failure to pay for the additional use in advance. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 14; Ex. 3 (Norton Decl.) ¶ 22; Ex. 4 (Roerig-Blong Decl.) ¶ 24
Steve N. Spelman, the Corbis executive responsible for Corbis' relationship with McGraw-Hill during much of the time period covered by Muench's claims, provided sworn testimony that "[m]y staff and I understood that any invoice that Corbis issued to McGraw-Hill was part of a larger, mutually beneficial relationship involving hundreds of transactions one after another, and all of those transactions were subject to the PPAs [Preferred Pricing Agreements] and the understandings that McGraw-Hill had developed during their years of doing business together." Def. Appendix, Ex. 2 (Spelman Decl.) at ¶¶ 7-14.
These successive pricing agreements and letter agreements, which were unbroken in duration from 2000 through the time period covered by Muench's claims, established the fees for different tiers of anticipated use, typically based on ranges of estimated print runs as well as other usage parameters falling within the agreed upon fees. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 7-14; Ex. 3 (Roerig-Blong Decl.) ¶ 11. (Def. Br. at 7).
The 2009 PPA established the pricing for uses beyond those originally anticipated, providing, "If McGraw-Hill desires to increase the total number of Unique Users after the initial license for such Image is granted, McGraw-Hill may re-license such Image .... McGraw-Hill acknowledges and agrees that Corbis will re-license images to McGraw-Hill following any License Term provided that Corbis still retains the right to represent and license such images." Def. Appendix, Ex. 2 (Spelman Decl.), Ex. C. (Def. Br. at 7).
Even before the memorialization of this principle in the 2009 PPA, McGraw-Hill understood that any additional use of a photo beyond the use initially paid for through an initial invoice would be priced based on the difference between that original invoice price and the price set in the applicable preferred pricing agreement for the amount of usage that later occurred. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 9-10, 14; Ex. 3 (Norton Decl.) ¶¶ 22-23; Ex. 4 (Roerig-Blong Decl.) ¶¶ 24-25.
Also, as relevant here, the 2003 PPA established that "electronic usage was included in the prices to be paid by McGraw-Hill", which meant that "electronic use was always authorized by Corbis even if it was not listed in the particular invoice." Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 9. Similarly, the term of the invoice agreement was extended to the life of the program in *87 this PPA. Def. Appendix, Ex. 2 (Spelman Decl. ¶ 10). According to Mr. Spelman, because the invoice form did not have an option for the employee at Corbis to enter a narrative stating as such, the Corbis employees were required to enter a number in the duration field, despite knowing and acknowledging that the actual duration was for the "life of the program/edition." Id. The 2003 PPA also removed any price difference based on distribution so that there would be no extra cost to McGraw-Hill for distribution around the world. Id.; see also Def. Appendix, Ex. 3 (Norton Decl.) ¶ 24; Ex 4. (Roerig-Blong Decl.) ¶ 26.
The 2006 PPA stated that "all languages" would be included in the standard price paid by McGraw-Hill to Corbis for the usage of any particular image. Def. Appendix, Ex. 1 (Beacher Decl.), Ex. B. at p. 14.
The 2003, 2006, and 2009 PPAs each established tiers of pricing based on estimated print runs. Def. Appendix, Ex. 3 (Norton Decl.) ¶¶ 23-24; Ex. 4 (Roerig-Blong Decl.) ¶¶ 25-26. The highest tier in each agreement provided for an unlimited number of copies. Id.
For example, in the 2006 and 2009 pricing agreements, McGraw-Hill and Corbis agreed to a price for usage of "over 250,000" and "over 5,000,000" unique users respectively. Def. Appendix, Ex. 1 (Beacher Decl.), Ex. B at p. 14; Ex. 2 (Spelman Decl.), Ex. C at p. 3.
Further, the 2009 PPA contained an agreed upon "increased use" provision that allowed McGraw-Hill to print beyond the stated amount on the invoice and pay for the additional prints later. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 14. This "Increased Use" provision memorialized the parties' prior practice that McGraw-Hill would make a payment to Corbis of "the higher of either the increased difference in the pricing grid in the PPA or $35" and "was a way of maintaining the mutually beneficial relationship between McGraw-Hill and Corbis." Id.
Pursuant to the parties' agreements providing a pricing level for an unlimited number of copies that could be distributed anywhere in the world, McGraw-Hill understood that the pricing agreements ensured that McGraw-Hill could use Corbis photos in unlimited numbers, subject to an obligation to pay Corbis for such usage at the price level for the maximum tier of unlimited use set by the applicable pricing agreement. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 9-10, 12-14; Ex. 3 (Norton Decl.) ¶ 24; Ex. 4 (Roerig-Blong Decl.) ¶ 26. (Def. Br. at 9).
The latest agreement, the 2014 PPA, explicitly provided that the price McGraw-Hill paid per photo would include worldwide distribution, printing in all languages, and a duration that would last the life of the program. Def. Appendix, Ex. 2 (Spelman Decl.), Ex. E. The first and only pricing tier listed on the 2014 PPA provided a pricing amount "for print runs/Unique users over 250,000." Id.
At no time did Corbis refuse McGraw-Hill's request for a non-exclusive license for any image that the agency was authorized to represent. Roerig-Blong Decl. ¶¶ 26-27; Norton Decl. ¶¶ 25-26. (Def. Br. at 9).
II. LEGAL STANDARD
Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is *88 genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). Summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).
On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, i.e., that reasonable jurors could differ about the evidence." Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc., 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014) (citing Fed. R. Civ. P. 56(c) ; Anderson, 477 U.S. at 250-51, 106 S.Ct. 2505 ). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting Lund's, Inc. v. Chem. Bank, 870 F.2d 840, 844 (2d Cir. 1989) ).
III. DISCUSSION
Plaintiff argues that its remaining claims sound in contract, not copyright, while Defendants argue the reverse. (Pl. Br. at 32). Defendants characterize the usage terms in the agreements between Corbis and Defendants as contractual covenants and not conditions precedent. (Def. Br. at 10). The reason the characterization is dispositive is because the Court of Appeals in Graham v. James held, "[g]enerally, if the licensee's improper conduct constitutes a breach of a covenant undertaken by the license ... and if such covenant constitutes an enforcible contractual obligation, then the licensor will have a cause of action for breach of contract, not copyright infringement." Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998) (alterations and quotation marks omitted). Both parties cite to the holding in Graham. (Def. Br. at 10; Pl. Br. at 32). It is therefore confusing when Plaintiff says, "[w]e need not labor here to decipher the distinctions between 'covenants' and 'conditions.' " (Pl. Br. at 35). This is exactly what the Court must do. For the following reasons, the Court agrees with Defendants' characterization, adopting the reasoning articulated in Sohm v. Scholastic, 2018 WL 1605214, at *12 (S.D.N.Y. Mar. 29, 2018). Accordingly, Defendants' motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.
State law governs the interpretation of a licensing contract, and the parties here argue on the basis of New York law. Sohm, 2018 WL 1605214, at *12. In finding the existence of a condition precedent, "[w]hile specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.' " Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., 821 F.3d 297, 305 (2d Cir. 2016) (quoting Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995) ). "The New York Court of Appeals has defined a condition precedent as 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.' " Tangorre v. Mako's, Inc., 2003 WL 470577, at *6 (S.D.N.Y. Jan. 6, 2003) (quoting *89 Oppenheimer, 86 N.Y.2d at 690, 636 N.Y.S.2d 734, 660 N.E.2d 415 ). In contrast, "contract obligations that are to be performed after partial performance by the other party are not treated as conditions." Graham, 144 F.3d at 237. Contract terms that merely delineate "acceptable" and "unacceptable" behavior under the licensing agreement are covenants. Sohm, 2018 WL 1605214, at *12 (citation omitted).
Plaintiff begins by averring "the Graham court did not address a key exception to the condition/covenant principle: a copyright holder cannot sue a licensee for copyright infringement when the licensee is acting within the scope of the license, if, however, a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." (Pl. Br. at 33) (citations omitted). The Court has read Graham and disagrees with Plaintiff's characterization of the case. The Court of Appeals specifically said, "What is disputed here is the scope of the license and how long the license lasted ... when the contested issue is the scope of a license, rather than the existence of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized under the license... the burden was on ... the copyright owner to show that the allegedly infringing acts were not allowed by the license." Graham, 144 F.3d at 236 (emphasis added). Not only did the Graham court address the key exception, it placed the burden on the plaintiff to prove the infringing acts were not allowed by the license.
Plaintiff tries to distinguish Graham, which classified the obligations in that case as covenants, on the grounds that the payments in that case involved "failure to pay royalties, not use after exhaustion of a license." (Pl. Br. at 32). The underlying principle, however, is the same. The dispute in Graham was over a license relating to the sale of a particular software version. Graham, 144 F.3d at 232. "[T]he district court could not have found that [defendant] infringed [plaintiff's] copyright unless the licensing agreement already had been rescinded." Id. at 236.
In discussing rescission of the agreement, the Court of Appeals found it relevant that the district court awarded the plaintiff breach of contract damages. Id. In the instant case, the parties have stipulated to a breach of contract on another set of claims. While this is not proof in itself, it belies Plaintiff's characterization of the relationship as one between "strangers." (Pl. Br. at 35).
The Court of Appeals held in Graham that in addition to nonpayment of royalties, removing the copyright notice also did not constitute a breach of a condition precedent. Graham, 144 F.3d at 236. What the Court takes from this holding is that there are a host of actions that on first blush may appear as outside of the scope of the license but are nonetheless within the scope of the license.
Plaintiff asserts that Defendants "never had any authorization to make the uses at issue here." (Pl. Br. at 33). This may be colloquially true, but it proves too much - Defendants, when they delayed sending their invoice requests, were also acting without "authorization." (Def. Br. at 6). But this was part of the dealings of the parties, and these lapses do not amount to an expiration of a license and copyright violation. As Defendants point out, "the [agreements] make clear the understanding between Corbis and McGraw-Hill: the parties had already agreed to a regime of various pricing levels based on the range of possible uses of the photos." (Pl. Br. at 14).
The court in Sohm, dealing with identical language, found that the relevant claims sounded in contract and not copyright.
*90 Sohm, 2018 WL 1605214, at *14. The relevant language to the instant case appears in the Licensing Terms and Conditions:
Unless otherwise specified in a separate writing signed by Corbis, your reproduction of Images is limited to...the specific use described in your invoice, which together with these terms shall constitute the full license granted.... Any license granted by Corbis is conditioned upon (i) your meeting all conditions and restrictions imposed by Corbis, and (ii) Corbis' receipt of full payment by you for such use as invoiced by Corbis. Your failure to make full payment when due shall terminate any license granted to you and entitles Corbis to pursue all remedies available under copyright or other applicable laws. You may not otherwise make, use or distribute copies of any Images for any purpose except as authorized.
[dkt. no. 104-1 at 11, 19]
As the court put it in Sohm, Defendants' license "was conditional on full payment as invoiced." Sohm, 2018 WL 1605214, at *13. As in that case, there was no failure here to pay as invoiced, rather there was a deficiency with the invoicing, i.e, there was an ex post exceeding of the terms permitted under the license invoices. This exceeding "is better understood as a violation of the provision prohibiting [the Defendant] from 'making, using or distributing copies of any Images for any purpose except as authorized,' " and not as a condition precedent. Id. at *13 (alterations omitted). Further, the court characterized breaching the limit on defendant's "reproduction of images to the specific use described in your invoice" as merely delineating acceptable and unacceptable behavior under the licensing agreement and therefore a covenant. Id.
Plaintiff also addresses the "ten-times" provision which provides, "Corbis in its sole discretion reserves the right to bill [Defendants] ... ten times the normal license fee for any unauthorized use." [dkt. no. 104-1 at 11, 19]. Plaintiff argues that "[t]he presence of a damages provision to calculate a fee in the event McGraw ignored the license limits does not undo the other terms in this agreement that make it clear that the license granted was restricted to the uses on the invoice." (Pl. Br. at 38). There is no citation for this proposition, and the Court does not agree with it. That the 2009 PPA included an increased use provision, but not a ten-times provision, is instructive. (Pl. Br. at 38). It demonstrates that the ten-times provision covered the same ground as the increased use provision, i.e., to address situations where there was an ex post desire on the part of Defendants to increase the total number of unique users. As discussed below, this ex ante contemplation of exceeding uses shows that the parties believed that royalty payment and proper invoicing could remedy any unauthorized uses.
Plaintiff is asserting that it is McGraw-Hill's lack of precision in their invoices that created the copyright claim. But this lack of precision is better characterized as breaching a covenant, and the cases cited by Plaintiff support such a characterization.
Plaintiff cites to Spinelli v. National Football League, where the Court of Appeals found that photographers' claims against the National Football League (the "NFL") sounded in copyright and not contract law. Spinelli v. Nat'l Football League, 903 F.3d 185, 202 (2d Cir. 2018). In Spinelli, plaintiffs contracted with the Associated Press to re-license their photos, just like instant Plaintiff contracted with Corbis. The license that the plaintiffs gave to the AP in that case did not permit the complimentary *91 sublicense the AP gave the NFL. "Because Plaintiffs are claiming that AP acted outside the scope of its license, they properly claim copyright infringement, not breach of contract." Id. at 202. For Plaintiff's purposes, this tracks nicely the "act[ing] outside the scope" of the license language that Plaintiff uses to describe McGraw-Hill's behavior. (Pl. Br. at 32). The trouble with this analogy is that it there are degrees to which a party can act outside of the scope of a license.
The Court of Appeals recognized as much. In a relevant footnote cited by neither Plaintiff nor Defendants, the Court of Appeals goes on to say, "We in no way suggest that a plaintiff can proceed on a copyright infringement claim simply by repackaging a claim for royalties as a claim that the alleged infringer exceeded the scope of a licensing agreement. In most cases, a sale or sublicense triggers a clearly applicable royalty obligation in a licensing agreement, and the remedy is a contractual one for payment of the specific royalty amount that the agreement provides. That is not the case here." Spinelli, 903 F.3d at 202 n.7.
But it is the case here. There was clearly a payment triggered that should have been invoiced properly, and as Defendants point out, Corbis never refused one of Defendants' requests. (Def. Br. at 9). This makes this case different from Spinelli where the NFL had no such agreement and could not remedy with the correct invoice and royalty payment as instant Defendants could. Cf. Spinelli, 903 F.3d at 196. ("AP had already granted a complimentary license to the NFL before it sought amendments to its contracts with Plaintiffs that would permit AP to do so.") To classify the instant case as an unauthorized use, is exactly the kind of repackaging the Court of Appeals cautioned against.
It is certainly the case that, at least colloquially, any covenant breacher is acting "outside the scope" of the contract - but as has been said, in a precise legal sense, not all "unacceptable" behavior according to the terms of a contract is outside its scope as a matter of law. Sohm, 2018 WL 1605214, at *13. The parties had certainly contemplated overusage, as evidenced by the 2009 PPA's increased use provision that allowed McGraw-Hill to print beyond the stated amount on the invoice and pay for the additional prints later. (Def. Br. at 9).
Plaintiff counters that the "increased use" provision was subject to a re-license of the photograph for an additional fee. (Pl. Br. at 38). But Plaintiff does not cite a crucial word in that provision. The 2009 PPA states, "If [McGraw-Hill] desires to increase the total number of Unique Users after the initial license for such Image is granted, MHE may re-license such Image, however, the additional fee will be the greater of [certain pricing terms]." (Pl. Appendix Ex. 2 at 24) (emphasis added). The relevant word here is "may." This makes this case different from Spinelli in that it was up to McGraw-Hill if it wanted to "re-license," whereas in Spinelli, the NFL was acting outside the scope of any agreement.
In the language of the Court of Appeals, this "re-license," is really a repackaged "clearly applicable royalty obligation" in a licensing agreement. There is no separate license truly considered, but rather what is contemplated is a royalty payment that can remedy the problems caused in the first license. Had Corbis ever turned down a McGraw-Hill request, that would lend support to the idea that the "re-license" was something more than a mere pro forma curative royalty payment. But Corbis never turned down such a request. (Def. Br. at 9).
*92 In the instant case, not only did the agreement permit the usage, but this was the whole point of the contract. That the terms of the contract were exceeded does not mean that this case is analogous to Spinelli where the usage of the relevant photos was effected by a unilateral decision on the part of the AP who was acting beyond what the photographers and the contract contemplated.
There is a similar gulf between this case and Kamakazi Music Corp. v. Robbins Music Corp., 684 F.2d 228 (2d Cir. 1982). In that case there was a contract that had expired between the parties, id. at 230, so there was no contract at the relevant time. Here the issue is overusage in an agreement where such overusage is contemplated both by the explicit language of the contract as well as past dealings between the parties.
These past dealings are not meant to imply that industry practice can supplant federal copyright law. Cf. Palmer/Kane LLC v. Rosen Book Works LLC, 204 F.Supp.3d 565, 575 (S.D.N.Y. 2016). In Palmer, the licenses' one-year term had expired, which established the basis for the copyright violation. Palmer, 204 F.Supp.3d at 580. Here, however, Defendants' payments and proper invoicing under the existing contract would have remedied the breach. The past dealings are meant to show that, unlike in Palmer, there is no "pre-license" claim here, but rather a license whose terms specifically contemplate its own extension through a royalty payment. This comports with the Court of Appeals' saying that "[i]n most cases, a sale or sublicense [that] triggers a clearly applicable royalty obligation in a licensing agreement" should sound in contract, not copyright. Spinelli, 903 F.3d at 202 n.7.
Plaintiff's attempt at distinguishing Sohm is equally unavailing. Plaintiff says that the agreement in that case was based on "entirely different volume-based pricing agreements, to which McGraw was not a party." (Pl. Br. at 39). The agreements are not "entirely different," but rather contain identical relevant language that was cited by the court as dispositive. Sohm, 2018 WL 1605214, at *13. Plaintiff tries to distinguish this identical language by saying "the pricing agreements in Sohm were never publicly filed, and Scholastic never revealed any of their specific terms." (Pl. Br. at 39). It is never explained why being publicly filed or having a certain degree of specificity of terminology is relevant to the holding of the case.
Plaintiff makes an analogy helpful to demonstrating the flaw in its argument. Plaintiff says that the licenses were "for one-time use, and were self-expiring, like a prepaid phone card." (Pl. Br. at 34). The argument goes that Defendants purchased a phone card with a definitive number of minutes on it and then went over their minutes. In going over their "minutes," i.e., authorized uses of the photos, Defendants breached a condition precedent to the contract and became a "stranger to the plaintiff-licensor." (Pl. Br. at 35).
The reason the phone card analogy fails is that it casts the agreements here in too rigid a light. If a phone card has a definitive number of minutes on it and those minutes are used up, then the phone card will cease to work. The agreement here specifically contemplates a range of uses. The nature of this agreement was such that the phone card Plaintiff purchased did not contain a definite number of minutes, but rather a range with flexibility that had been negotiated and refined through practice.
Clearly McGraw-Hill was not a stranger to Corbis. Their relationship did not cease with any violation of the license. Under Plaintiff's reading, the delay in sending the invoices would also make McGraw-Hill a *93 stranger to the contract. The Court declines to adopt this literalist reading.
The above analysis, in conjunction with New York's "presumption favoring covenants over conditions," points to classifying the payment terms of the agreement as covenants. Graham, 144 F.3d at 237 (2d Cir. 1998).
IV. CONCLUSION
For the reasons stated above, Defendants' motion for summary judgment [dkt. no. 105] is granted. Plaintiff's Findings of Fact and Conclusions of Law [dkt. no. 108], which the Court in construes as a motion for summary judgment, is denied. The Clerk of Court shall enter a judgment for Defendants.
SO ORDERED.