# United States Court of Appeals for the Federal Circuit

2008-1001

ROBERT JACOBSEN,

Plaintiff-Appellant,

v.

MATTHEW KATZER and
KAMIND ASSOCIATES, INC. (doing business as KAM Industries),

Defendants-Appellees.


Victoria K. Hall, Law Office of Victoria K. Hall, of Bethesda, Maryland, argued for plaintiff-appellant.

R. Scott Jerger, Field Jerger LLP, of Portland, Oregon, argued for defendants-appellees.

Anthony T. Falzone, Stanford Law School, Center for Internet and Society, of Stanford, California, for amici curiae Creative Commons Corporation, et al. With him on the brief was Christopher K. Ridder.

Appealed from: United States District Court for the Northern District of California

Judge Jeffrey S. White

# United States Court of Appeals for the Federal Circuit

2008-1001

ROBERT JACOBSEN,

Plaintiff-Appellant,

v.

MATTHEW KATZER and
KAMIND ASSOCIATES, INC. (doing business as KAM Industries),

Defendants-Appellees.

Appeal from the United States District Court for the Northern District of California in case no. 06-CV-1905, Judge Jeffrey S. White.

_____

DECIDED: August 13, 2008

_____

Before MICHEL, Chief Judge, PROST, Circuit Judge, and HOCHBERG,[*] District Judge.

HOCHBERG, District Judge.

We consider here the ability of a copyright holder to dedicate certain work to free public use and yet enforce an "open source" copyright license to control the future distribution and modification of that work. Appellant Robert Jacobsen ("Jacobsen") appeals from an order denying a motion for preliminary injunction. Jacobsen v. Katzer, No. 06-CV-01905 JSW, 2007 WL 2358628 (N.D. Cal. Aug. 17, 2007). Jacobsen holds a copyright to computer programming code. He makes that code available for public download from a

---

[*] The Honorable Faith S. Hochberg, District Judge, United States District Court for the District of New Jersey, sitting by designation.

website without a financial fee pursuant to the Artistic License, an "open source" or public license.  Appellees Matthew Katzer and Kamind Associates, Inc. (collectively "Katzer/Kamind") develop commercial software products for the model train industry and hobbyists.  Jacobsen accused Katzer/Kamind of copying certain materials from Jacobsen's website and incorporating them into one of Katzer/Kamind's software packages without following the terms of the Artistic License.  Jacobsen brought an action for copyright infringement and moved for a preliminary injunction.

The District Court held that the open source Artistic License created an "intentionally broad" nonexclusive license which was unlimited in scope and thus did not create liability for copyright infringement.  The District Court reasoned:

> The plaintiff claimed that by modifying the software the defendant had exceeded the scope of the license and therefore infringed the copyright. Here, however, the JMRI Project license provides that a user may copy the files verbatim or may otherwise modify the material in any way, including as part of a larger, possibly commercial software distribution. The license explicitly gives the users of the material, any member of the public, "the right to use and distribute the [material] in a more-or-less customary fashion, plus the right to make reasonable accommodations."  The scope of the nonexclusive license is, therefore, intentionally broad. The condition that the user insert a prominent notice of attribution does not limit the scope of the license. Rather, Defendants' alleged violation of the conditions of the license may have constituted a breach of the nonexclusive license, but does not create liability for copyright infringement where it would not otherwise exist.

Jacobsen, 2007 WL 2358628 at *7 (internal citations omitted).

On this basis, the District Court denied the motion for a preliminary injunction.  We vacate and remand.

## I.

Jacobsen manages an open source software group called Java Model Railroad Interface ("JMRI").  Through the collective work of many participants, JMRI created a

computer programming application called DecoderPro, which allows model railroad enthusiasts to use their computers to program the decoder chips that control model trains. DecoderPro files are available for download and use by the public free of charge from an open source incubator website called SourceForge; Jacobsen maintains the JMRI site on SourceForge. The downloadable files contain copyright notices and refer the user to a "COPYING" file, which clearly sets forth the terms of the Artistic License.

Katzer/Kamind offers a competing software product, Decoder Commander, which is also used to program decoder chips. During development of Decoder Commander, one of Katzer/Kamind's predecessors or employees is alleged to have downloaded the decoder definition files from DecoderPro and used portions of these files as part of the Decoder Commander software. The Decoder Commander software files that used DecoderPro definition files did not comply with the terms of the Artistic License. Specifically, the Decoder Commander software did not include (1) the authors' names, (2) JMRI copyright notices, (3) references to the COPYING file, (4) an identification of SourceForge or JMRI as the original source of the definition files, and (5) a description of how the files or computer code had been changed from the original source code. The Decoder Commander software also changed various computer file names of DecoderPro files without providing a reference to the original JMRI files or information on where to get the Standard Version.[1]

---

[1] Katzer/Kamind represents that all potentially infringing activities using any of the disputed material have been voluntarily ceased. The district court held that it could not find as a matter of law that Katzer/Kamind's voluntary termination of allegedly wrongful activity renders the motion for preliminary injunction moot because it could not find as a matter of law that it is absolutely clear that the alleged behavior could not recur. Jacobsen, 2007 WL 2358628 at *5. We agree that this matter is not moot. See also Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) ("Voluntary cessation of challenged conduct moots a case . . . only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (emphasis in original)).

Jacobsen moved for a preliminary injunction, arguing that the violation of the terms of the Artistic License constituted copyright infringement and that, under Ninth Circuit law, irreparable harm could be presumed in a copyright infringement case. The District Court reviewed the Artistic License and determined that "Defendants' alleged violation of the conditions of the license may have constituted a breach of the nonexclusive license, but does not create liability for copyright infringement where it would not otherwise exist." Id. at *7. The District Court found that Jacobsen had a cause of action only for breach of contract, rather than an action for copyright infringement based on a breach of the conditions of the Artistic License. Because a breach of contract creates no presumption of irreparable harm, the District Court denied the motion for a preliminary injunction.

Jacobsen appeals the finding that he does not have a cause of action for copyright infringement. Although an appeal concerning copyright law and not patent law is rare in our Circuit, here we indeed possess appellate jurisdiction. In the district court, Jacobsen's operative complaint against Katzer/Kamind included not only his claim for copyright infringement, but also claims seeking a declaratory judgment that a patent issued to Katzer is not infringed by Jacobsen and is invalid. Therefore the complaint arose in part under the patent laws. See 28 U.S.C. § 2201(a); Golan v. Pingel Enter., 310 F.3d 1360, 1367 (Fed. Cir. 2002) (explaining that "[i]n the context of a complaint seeking a declaration of noninfringement, the action threatened by the declaratory defendant . . . would be an action for patent infringement," and "[s]uch an action clearly arises under the patent laws"). Thus the district court's jurisdiction was based, at least in part, on 28 U.S.C. § 1338(a) as it relates to the patent laws, and we have appellate jurisdiction under 28 U.S.C. § 1292(c)(1). See 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil

action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks."); id. at § 1295(a)(1) (The Federal Circuit shall have exclusive jurisdiction "of an appeal from a final decision of a district court of the United States" if (1) "the jurisdiction of that court was based, in whole or in part, on section 1338 of this title" and (2) the case is not "a case involving a claim arising under any Act of Congress relating to copyrights, exclusive rights in mask works, or trademarks and no other claims under section 1338(a)."); id. at § 1292(c)(1) (Federal Circuit shall have jurisdiction over appeals from interlocutory orders of the district courts refusing injunctions "in any case over which the court would have jurisdiction of an appeal under section 1295").

## II.

This Court looks to the interpretive law of the regional circuit for issues not exclusively assigned to the Federal Circuit. Hutchins v. Zoll Med. Corp., 492 F.3d 1377, 1383 (Fed. Cir. 2007). Under Ninth Circuit law, an order granting or denying a preliminary injunction will be reversed only if the district court relied on an erroneous legal premise or abused its discretion. Wright v. Rushen, 642 F.2d 1129, 1132 (9th Cir. 1981). A district court's order denying a preliminary injunction is reversible for factual error only when the district court rests its conclusions on clearly erroneous findings of fact. Sports Form, Inc. v. United Press Int'l, Inc., 686 F.2d 750, 753 (9th Cir. 1982).

In determining whether to issue a preliminary injunction, the Ninth Circuit requires demonstration of (1) a combination of probability of success on the merits and the possibility of irreparable harm; or (2) serious questions going to the merits where the balance of hardships tips sharply in the moving party's favor. Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701, 713-14 (9th Cir. 2007); Dep't of Parks & Recreation v.

<u>Bazaar Del Mundo, Inc.</u>, 448 F.3d 1118, 1123 (9th Cir. 2006). In cases involving copyright claims, where a copyright holder has shown likelihood of success on the merits of a copyright infringement claim, the Ninth Circuit has held that irreparable harm is presumed. <u>LGS Architects, Inc. v. Concordia Homes of Nev.</u>, 434 F.3d 1150, 1155-56 (9th Cir. 2006). <u>But see</u> <u>MGM Studios, Inc. v. Grokster, Ltd.</u>, 518 F. Supp. 2d 1197, 1212 (C.D. Cal. 2007) (noting that "the longstanding rule that irreparable harm can be a presumed after a showing of likelihood of success for purposes of a copyright preliminary injunction motion may itself have to be reevaluated in light of <u>eBay [Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388 (2006)]"). Thus, for a preliminary injunction to issue, Jacobsen must either show (1) a likelihood of success on the merits of his copyright infringement claim from which irreparable harm is presumed; or (2) a fair chance of success on the merits and a clear disparity in the relative hardships that tips sharply in his favor.

A.

Public licenses, often referred to as "open source" licenses, are used by artists, authors, educators, software developers, and scientists who wish to create collaborative projects and to dedicate certain works to the public. Several types of public licenses have been designed to provide creators of copyrighted materials a means to protect and control their copyrights. Creative Commons, one of the amici curiae, provides free copyright licenses to allow parties to dedicate their works to the public or to license certain uses of their works while keeping some rights reserved.

Open source licensing has become a widely used method of creative collaboration that serves to advance the arts and sciences in a manner and at a pace that few could have imagined just a few decades ago. For example, the Massachusetts Institute of

Technology ("MIT") uses a Creative Commons public license for an OpenCourseWare project that licenses all 1800 MIT courses.  Other public licenses support the GNU/Linux operating system, the Perl programming language, the Apache web server programs, the Firefox web browser, and a collaborative web-based encyclopedia called Wikipedia. Creative Commons notes that, by some estimates, there are close to 100,000,000 works licensed under various Creative Commons licenses.  The Wikimedia Foundation, another of the amici curiae, estimates that the Wikipedia website has more than 75,000 active contributors working on some 9,000,000 articles in more than 250 languages.

Open Source software projects invite computer programmers from around the world to view software code and make changes and improvements to it.  Through such collaboration, software programs can often be written and debugged faster and at lower cost than if the copyright holder were required to do all of the work independently.  In exchange and in consideration for this collaborative work, the copyright holder permits users to copy, modify and distribute the software code subject to conditions that serve to protect downstream users and to keep the code accessible.[2]  By requiring that users copy and restate the license and attribution information, a copyright holder can ensure that recipients of the redistributed computer code know the identity of the owner as well as the scope of the license granted by the original owner.  The Artistic License in this case also requires that changes to the computer code be tracked so that downstream users know what part of the computer code is the original code created by the copyright holder and what part has been newly added or altered by another collaborator.

---

[2]     For example, the GNU General Public License, which is used for the Linux operating system, prohibits downstream users from charging for a license to the software. See Wallace v. IBM Corp., 467 F.3d 1104, 1105-06 (7th Cir. 2006).

Traditionally, copyright owners sold their copyrighted material in exchange for money. The lack of money changing hands in open source licensing should not be presumed to mean that there is no economic consideration, however. There are substantial benefits, including economic benefits, to the creation and distribution of copyrighted works under public licenses that range far beyond traditional license royalties. For example, program creators may generate market share for their programs by providing certain components free of charge. Similarly, a programmer or company may increase its national or international reputation by incubating open source projects. Improvement to a product can come rapidly and free of charge from an expert not even known to the copyright holder. The Eleventh Circuit has recognized the economic motives inherent in public licenses, even where profit is not immediate. See Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1200 (11th Cir. 2001) (Program creator "derived value from the distribution [under a public license] because he was able to improve his Software based on suggestions sent by end-users. . . . It is logical that as the Software improved, more end-users used his Software, thereby increasing [the programmer's] recognition in his profession and the likelihood that the Software would be improved even further.").

B.

The parties do not dispute that Jacobsen is the holder of a copyright for certain materials distributed through his website.[3] Katzer/Kamind also admits that portions of the DecoderPro software were copied, modified, and distributed as part of the Decoder Commander software. Accordingly, Jacobsen has made out a prima facie case of copyright infringement. Katzer/Kamind argues that they cannot be liable for copyright

---

[3] Jacobsen's copyright registration creates the presumption of a valid copyright.

infringement because they had a license to use the material.  Thus, the Court must evaluate whether the use by Katzer/Kamind was outside the scope of the license.  See LGS Architects, 434 F.3d at 1156.  The copyrighted materials in this case are downloadable by any user and are labeled to include a copyright notification and a COPYING file that includes the text of the Artistic License.  The Artistic License grants users the right to copy, modify, and distribute the software:

> provided that [the user] insert a prominent notice in each changed file stating how and when [the user] changed that file, and provided that [the user] do at least ONE of the following:
> a) place [the user's] modifications in the Public Domain or otherwise make them Freely Available, such as by posting said modifications to Usenet or an equivalent medium, or placing the modifications on a major archive site such as ftp.uu.net, or by allowing the Copyright Holder to include [the user's] modifications in the Standard Version of the Package.
> b) use the modified Package only within [the user's] corporation or organization.
> c) rename any non-standard executables so the names do not conflict with the standard executables, which must also be provided, and provide a separate manual page for each nonstandard executable that clearly documents how it differs from the Standard Version, or
> d) make other distribution arrangements with the Copyright Holder.

The heart of the argument on appeal concerns whether the terms of the Artistic License are conditions of, or merely covenants to, the copyright license.  Generally, a "copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement" and can sue only for breach of contract.  Sun Microsystems, Inc., v. Microsoft Corp., 188 F.3d 1115, 1121 (9th Cir. 1999); Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998).  If, however, a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for

 See, e.g., Triad Sys. Corp. V. Se. Exp. Co., 64 F.3d 1330, 1335 (9th Cir. 1995).

copyright infringement. <u>See</u> <u>S.O.S., Inc. v. Payday, Inc.</u>, 886 F.2d 1081, 1087 (9th Cir.1989); Nimmer on Copyright, § 1015[A] (1999).

Thus, if the terms of the Artistic License allegedly violated are both covenants and conditions, they may serve to limit the scope of the license and are governed by copyright law.  If they are merely covenants, by contrast, they are governed by contract law.  <u>See</u> <u>Graham</u>, 144 F.3d at 236-37 (whether breach of license is actionable as copyright infringement or breach of contract turns on whether provision breached is condition of the license, or mere covenant); <u>Sun Microsystems</u>, 188 F.3d at 1121 (following <u>Graham</u>; independent covenant does not limit scope of copyright license).  The District Court did not expressly state whether the limitations in the Artistic License are independent covenants or, rather, conditions to the scope; its analysis, however, clearly treated the license limitations as contractual covenants rather than conditions of the copyright license.[4]

Jacobsen argues that the terms of the Artistic License define the scope of the license and that any use outside of these restrictions is copyright infringement. Katzer/Kamind argues that these terms do not limit the scope of the license and are merely covenants providing contractual terms for the use of the materials, and that his violation of them is neither compensable in damages nor subject to injunctive relief.  Katzer/Kamind's argument is premised upon the assumption that Jacobsen's copyright gave him no economic rights because he made his computer code available to the public at no charge. From this assumption, Katzer/Kamind argues that copyright law does not recognize a

---

[4]    The District Court held that "Defendants' alleged violation of the conditions of the license may have constituted a breach of the nonexclusive license . . . [and] the Court finds that Plaintiff's claim properly sounds in contract."  <u>Jacobsen</u>, 2007 WL 2358628 at *7. Thus, despite the use of the word "conditions," the District Court treated the terms of the Artistic License as contractual covenants which did not limit the scope of the license.

cause of action for non-economic rights, relying on Gilliam v. ABC, 538 F.2d 14, 20-21 (2d Cir. 1976) ("American copyright law, as presently written, does not recognize moral rights or provide a cause of action for their violation, since the law seeks to vindicate the economic, rather than the personal rights of authors."). The District Court based its opinion on the breadth of the Artistic License terms, to which we now turn.

III.

The Artistic License states on its face that the document creates conditions: "The intent of this document is to state the <u>conditions</u> under which a Package may be copied." (Emphasis added.) The Artistic License also uses the traditional language of conditions by noting that the rights to copy, modify, and distribute are granted "<u>provided that</u>" the conditions are met. Under California contract law, "provided that" typically denotes a condition. See, e.g., Diepenbrock v. Luiz, 159 Cal. 716 (1911) (interpreting a real property lease reciting that when the property was sold, "this lease shall cease and be at an end, <u>provided that</u> the party of the first part shall then pay [certain compensation] to the party of the second part"; considering the appellant's "interesting and ingenious" argument for interpreting this language as creating a mere covenant rather than a condition; and holding that this argument "cannot change the fact that, attributing the usual and ordinary signification to the language of the parties, a <u>condition</u> is found in the provision in question") (emphases added).

The conditions set forth in the Artistic License are vital to enable the copyright holder to retain the ability to benefit from the work of downstream users. By requiring that users who modify or distribute the copyrighted material retain the reference to the original source files, downstream users are directed to Jacobsen's website. Thus, downstream users

know about the collaborative effort to improve and expand the SourceForge project once they learn of the "upstream" project from a "downstream" distribution, and they may join in that effort.

The District Court interpreted the Artistic License to permit a user to "modify the material in any way" and did not find that any of the "provided that" limitations in the Artistic License served to limit this grant. The District Court's interpretation of the conditions of the Artistic License does not credit the explicit restrictions in the license that govern a downloader's right to modify and distribute the copyrighted work. The copyright holder here expressly stated the terms upon which the right to modify and distribute the material depended and invited direct contact if a downloader wished to negotiate other terms. These restrictions were both clear and necessary to accomplish the objectives of the open source licensing collaboration, including economic benefit. Moreover, the District Court did not address the other restrictions of the license, such as the requirement that all modification from the original be clearly shown with a new name and a separate page for any such modification that shows how it differs from the original.

Copyright holders who engage in open source licensing have the right to control the modification and distribution of copyrighted material. As the Second Circuit explained in Gilliam v. ABC, 538 F.2d 14, 21 (2d Cir. 1976), the "unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright." Copyright licenses are designed to support the right to exclude; money damages alone do not support or enforce that right. The choice to exact consideration in the form of compliance with the open source requirements of disclosure and explanation of changes,

rather than as a dollar-denominated fee, is entitled to no less legal recognition. Indeed, because a calculation of damages is inherently speculative, these types of license restrictions might well be rendered meaningless absent the ability to enforce through injunctive relief.

In this case, a user who downloads the JMRI copyrighted materials is authorized to make modifications and to distribute the materials "provided that" the user follows the restrictive terms of the Artistic License. A copyright holder can grant the right to make certain modifications, yet retain his right to prevent other modifications. Indeed, such a goal is exactly the purpose of adding conditions to a license grant.[5] The Artistic License, like many other common copyright licenses, requires that any copies that are distributed contain the copyright notices and the COPYING file. See, e.g., 3-10 Nimmer on Copyright § 10.15 ("An express (or possibly an implied) condition that a licensee must affix a proper copyright notice to all copies of the work that he causes to be published will render a publication devoid of such notice without authority from the licensor and therefore, an infringing act.").

It is outside the scope of the Artistic License to modify and distribute the copyrighted materials without copyright notices and a tracking of modifications from the original computer files. If a downloader does not assent to these conditions stated in the COPYING

---

[5] Open source licensing restrictions are easily distinguished from mere "author attribution" cases. Copyright law does not automatically protect the rights of authors to credit for copyrighted materials. See Gilliam, 538 F.2d at 20-21 ("American copyright law, as presently written, does not recognize moral rights or provide a cause of action for their violation, since the law seeks to vindicate the economic, rather than the personal rights of authors."); Graham, 144 F.3d at 236. Whether such rights are protected by a specific license grant depends on the language of the license. See County of Ventura v. Blackburn, 362 F.2d 515, 520 (9th Cir. 1966) (copyright infringement found where the county removed copyright notices from maps licensed to it where the license granted the county "the right to

file, he is instructed to "make other arrangements with the Copyright Holder." Katzer/Kamind did not make any such "other arrangements." The clear language of the Artistic License creates conditions to protect the economic rights at issue in the granting of a public license. These conditions govern the rights to modify and distribute the computer programs and files included in the downloadable software package. The attribution and modification transparency requirements directly serve to drive traffic to the open source incubation page and to inform downstream users of the project, which is a significant economic goal of the copyright holder that the law will enforce. Through this controlled spread of information, the copyright holder gains creative collaborators to the open source project; by requiring that changes made by downstream users be visible to the copyright holder and others, the copyright holder learns about the uses for his software and gains others' knowledge that can be used to advance future software releases.

IV.

---

obtain duplicate tracings" from photographic negatives that contained copyright notices).

For the aforementioned reasons, we vacate and remand. While Katzer/Kamind appears to have conceded that they did not comply with the aforedescribed conditions of the Artistic License, the District Court did not make factual findings on the likelihood of success on the merits in proving that Katzer/Kamind violated the conditions of the Artistic License. Having determined that the terms of the Artistic License are enforceable copyright conditions, we remand to enable the District Court to determine whether Jacobsen has demonstrated (1) a likelihood of success on the merits and either a presumption of irreparable harm or a demonstration of irreparable harm; or (2) a fair chance of success on the merits and a clear disparity in the relative hardships and tipping in his favor.[6]

The judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.

<u>VACATED</u> and <u>REMANDED</u>

---

[6] At oral argument, the parties admitted that there might be no way to calculate any monetary damages under a contract theory.