**Michael BERGT, Plaintiff,**

v.

**McDOUGAL LITTELL, a division of Houghton Mifflin Company, and R.R. Donnelley & Sons Company, Defendants.**

**Case No. 06 C 4645.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 14, 2009.

Christopher Seidman, Harmon & Seidman LLC, Grand Junction, CO, E. Bryan Dunigan, III, Law Offices of E. Bryan Dunigan, Chicago, IL, Maurice J. Harmon, Harmon & Seidman LLC, Northampton, PA, for Plaintiff.

Christina M. Tchen, Edward Michael Crane, Albert Lee Hogan, III, David Richard Pehlke, Jason R. Braswell, Skadden Arps Slate Meagher & Flom, LLP CH, Chicago, IL, for Defendants.

## OPINION AND ORDER

JOAN HUMPHREY LEFKOW,
District Judge.

Plaintiff, Michael Bergt ("Bergt"), filed suit against defendants, McDougal Littell, a division of Houghton Mifflin Company ("McDougal"), and R.R. Donnelley & Sons Company ("Donnelley") (together, "defendants") for copyright infringement and fraud.[1] Pending before the court are three motions for partial summary judgment. Bergt seeks a judgment of liability against defendants for copyright infringement under the Copyright Act of 1976, codified at 17 U.S.C. §§ 101 *et seq.* McDougal seeks summary judgment on Bergt's fraud claim, request for punitive damages, and request for disgorgement of McDougal's profits. Donnelley seeks summary judgment on Bergt's request for disgorgement of Donnelley's profits. For the following reasons, Bergt's motion for summary judgment on defendants' liability for copyright infringement [# 70] is denied; McDougal's motion for summary judgment on Bergt's fraud claim, request for punitive damages, and request for disgorgement of McDougal's profits [# 71] is granted in part and denied in part; and Donnelley's motion for summary judgment on Bergt's request for disgorgement of Donnelley's profits [# 75] is denied.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir.2000).

## BACKGROUND

Bergt is a professional painter and sculptor who resides in New Mexico. He created the painting *Primavera* ("the painting") in 1995 and registered it with the U.S. Copyright Office as # VA 1–340–751 in 2006. McDougal is a textbook publisher with its principal place of business in Evanston, Illinois. Donnelley is a full-service printer with its global headquarters in Chicago, Illinois.

---

**1.** The court has jurisdiction over Bergt's copyright infringement claim under 28 U.S.C. § 1331 and § 1338, and over Bergt's fraud claim under 28 U.S.C. § 1367.

Sometime before August 6, 1998, Bergt received a phone call from an unidentified McDougal employee requesting permission to use the painting in the textbook *The Language of Literature*, Grade 9, 2000 edition ("the textbook"). While the details of the conversation are disputed, Bergt recalls agreeing to the request and referring the McDougal employee to his agent, DC Moore Gallery ("DC Moore"), for further processing.[2] On August 6, 1998, McDougal employee Carmen Fantasia ("Fantasia") sent a letter to Sandy Paci ("Paci") of DC Moore, requesting permission to reproduce the painting in the textbook. McDougal offered to pay for "inside editorial use in [the textbook], North American Rights, for a print run of 40,000." Ex. 2 to McDougal's L.R. 56.1 Stmt., hereinafter "August 6 Letter." On August 11, 1998, Paci sent an invoice, along with a transparency of the painting, to Fantasia. In the invoice, DC Moore granted McDougal rights to reproduce the painting in the textbook, but did not make reference to a specific print run or the other conditions mentioned in the August 6 letter, and did not place any other limitations on the license. Subsequently, McDougal paid DC Moore the $200 licensing fee.

The painting can be found on page 669 of the textbook, accompanying the story "Daughter of Invention" by Julia Alvarez. It is a full-page, color reproduction. Additionally, the painting is reproduced on a portion of page 669 of the teacher's edition and is the subject of a mini-lesson on the same page.

As of August 6, 1998, more than 272,000 copies of the 1997 edition of *The Language of Literature*, Grade 9 had been printed. Around this time, McDougal had forecasted that the textbook would sell approximately 310,000 copies. Defendants have printed and distributed over 1.3 million copies of the student and teacher editions of the textbook containing the painting. Bergt received notice of the fact that McDougal continued to reproduce his painting in the textbook in early 2006 when contacted by his current attorney, Mr. Chris Seidman, who inquired about Bergt's license with McDougal as part of research for a similar case. Bergt filed this case shortly thereafter.

## DISCUSSION

### I. Bergt's Motion for Partial Summary Judgment on McDougal's and Donnelley's Liability for Copyright Infringement

Under the Copyright Act of 1976, codified at 17 U.S.C. § 101 *et seq.*, "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords . . . (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. "Anyone who violates any of the exclusive rights of the copyright owner as provided by section 106 . . . is an infringer of the copyright or right of the author, as the case may be." *Id.* § 501.

---

**2.** Defendants do not dispute this phone call having taken place in opposing Bergt's motion for summary judgment on defendants' liability for copyright infringement. In support of its motion for summary judgment on Bergt's fraud claim, however, McDougal denies that this conversation, or any other direct conversation, took place between Bergt and any McDougal employee. It claims its first

contact with regard to licensing the painting occurred on August 6, 1998, when it sent a letter to DC Moore requesting permission to use the painting. McDougal claims it knew to contact DC Moore about the painting because it saw the painting reproduced in *American Artist* magazine, accompanied by the words "Courtesy DC Moore Gallery, New York, New York." Ex. 5 to McDougal's L.R. 56.1 Stmt.

To establish copyright infringement, the plaintiff must show (1) ownership of a valid copyright and (2) the defendant's unauthorized copying of protected elements of the copyrighted material. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007, 1011 (7th Cir.2005). Where the plaintiff has granted the defendant a license, to establish the second element, the plaintiff must demonstrate that the license was limited in scope and that the scope of the license has been exceeded. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996) ("The licensee violates the copyright by exceeding the scope of [the] license."); *Jacobsen v. Katzer,* 535 F.3d 1373, 1380 (Fed.Cir.2008) ("If ... a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement."); 3–10 Nimmer on Copyright § 10.15[A] (2009) ("[W]hen a license is limited in scope, exploitation of the copyrighted work outside the specified limits constitutes infringement.").

It is undisputed that Bergt owns the copyright for the painting, which is registered with the U.S. Copyright Office as # VA 1–340–751. Ex. 3 to Pl.'s L.R. 56.1 Stmt. All parties agree that McDougal received a license to reproduce the painting, although they disagree on whether it was limited or not. If the license was indeed limited to 40,000 copies, as Bergt claims, defendants have infringed Bergt's copyright as they have printed and distributed over 1.3 million copies of the textbook containing the painting. If the license was not limited, no copyright infringement has occurred. As discussed below, because the scope of the license remains in dispute, granting summary judgment on the issue of liability is inappropriate.

Bergt alleges that he provided McDougal with an oral license, limited to a print run of 40,000, during a telephone conversation with an unidentified McDougal employee. He further claims that the exchange of letters between McDougal and DC Moore limited the license in the same manner.

## A. Oral License

To support his argument that the license was limited in scope during a telephone conversation with an unidentified McDougal employee, Bergt relies on a portion of his own deposition testimony. In his deposition, Bergt stated that McDougal "told [him] the print run was 40,000.... That was in the telephone conversation" with the unidentified McDougal employee. Ex. 1 to Pl.'s L.R. 56.1 Stmt at 114:20–22, hereinafter "Bergt Dep."; *id.* at 94:14–20. This is the only evidence Bergt presents with respect to the occurrence and details of this conversation.

Defendants counter Bergt's evidence with other portions of his deposition relating to the same phone conversation.[3] When first asked about when he learned of McDougal's interest in using the painting, Bergt did not refer to any limitations being agreed to with regard to McDougal's use of the painting. In describing the conversation, Bergt stated:

Well, I asked her, you know, what would the use be. She said, "Well, we're doing this book. It's for education. It's for the children. We don't have a giant budget, and we usually have to change these regularly. And if you want to

**3.** Bergt has omitted this exchange from Ex. 1 to Pl.'s L.R. 56.1 Stmt. The omitted pages of the transcript, pages 77–84, can be found in Ex. 8 to McDougal's L.R. 56.1 Stmt. The court will refer collectively to these two exhibits as "Bergt Dep."

have the piece reproduced, I think our set fee for this is $200."

*Id.* at 82:22–83:2. Bergt did not recall the McDougal employee having said anything else. Id. at 83:3–4. Bergt agreed to the use. *Id.* at 83:6–8 ("I said, you know, 'If it is a textbook for kids, it sounds like a good source for me.' I said, 'It seems like a good application.' "). Bergt recalled having a conversation about the format McDougal needed for reproduction purposes and referring the McDougal employee to DC Moore, *id.* at 83:10–84:5, 84:15–85:9, but when asked if the McDougal employee said anything else about the use of the painting, he stated "Not that I recall." *Id.* at 83:3–4.

Only later in the deposition, after defendants' attorney specifically mentioned the 40,000 figure in relation to Bergt's initial conversations with his attorney, did Bergt state that the 40,000 print run term was part of the oral agreement:

Q. Did there come a point in time in the conversations [with Bergt's attorney, Mr. Seidman] where Mr. Seidman mentioned to you that there was a print run of 40,000—

A. Yes.

Q. —of the book?

A. Sure. That's what I recall the original conversation was, with McDougal.

Q. Well, tell me about that, because that's not what you said earlier in the conversation. You're referring to your first conversation?

A. Yes.

Q. What exactly was said in the first conversation about that?

A. I'm fairly sure that they did mention a prior run.[4] But certainly in that e-mail, it lists the print run.

*Id.* at 94:14–95:4.

■ Construing Bergt's deposition testimony in the light most favorable to defendants, the non-moving party, and drawing all reasonable inferences in their favor, the court is left with inconsistent versions of the telephone conversation, one of which would negate defendants' liability for copyright infringement. Determining which version of Bergt's testimony to credit is not the role of the court at the summary judgment stage. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir.2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). Thus, a genuine issue of material fact remains as to whether the license agreed to by Bergt and an unidentified McDougal employee limited use of the painting to only 40,000 copies.

**B. Exchange of Letter and Invoice Between McDougal and DC Moore**

■ Bergt also relies on the August 6, 1998 letter from Fantasia to Paci, which requested rights "for a print run of 40,000" to support his claim that the license was limited in scope. *See* August 6 Letter. Although DC Moore's invoice did not contain this language, Bergt states that it

---

4. While defendants focus on Bergt's use of the term "prior run" instead of "print run" in this exchange as further evidence that no print run term was discussed during the phone conversation, Bergt argues that this could be a transcription error. Bergt does refer to a "print run" in a later portion of his deposition. *See* Bergt Dep. 114:20–22.

implicitly incorporated the limitation. Should Bergt establish at trial that an oral license for a print run of 40,000 copies existed when Fantasia sent the August 6, 1998 letter to DC Moore, the issue of whether the 40,000 print run term mentioned in that letter was incorporated in DC Moore's invoice will be moot. Because the scope of the oral license is disputed, however, the exchange must be examined here.

In attempting to demonstrate that the DC Moore invoice included the 40,000 copy limitation, Bergt relies heavily on this court's order in ruling on an earlier motion to dismiss. *See Bergt v. McDougal Littell,* No. 06 C 4645, 2006 WL 3782919 (N.D.Ill. Dec. 21, 2006). The court found that "since there is nothing in the [invoice] that manifests an intention other than to accept McDougal's offer as stated in its letter, DC Moore's [invoice] can only be fairly interpreted at this stage of the proceedings as an unequivocal acceptance." *Id.* at *3.

Reliance on this court's decision on a motion to dismiss is inappropriate at the summary judgment stage. Different standards apply to a Rule 12(b)(6) motion to dismiss and a Rule 56(c) motion for summary judgment. *See McMillan v. Collection Prof'ls, Inc.,* 455 F.3d 754, 760 (7th Cir.2006) (summary judgment standard is "a different and significantly more demanding standard than the Rule 12(b)(6) standard"). In deciding a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir.1999). By contrast, in considering a Rule 56(c) motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party, in this case, defendants, and draw all reasonable inferences in their favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, the court must now reexamine whether DC Moore's invoice included the 40,000 print run limitation using the appropriate summary judgment standard.

Bergt relies on McDougal's request letter and Responses to Plaintiff's First Requests for Admissions as evidence that the license included the 40,000 print run limitation. Exs. 4 and 5 to Pl's L.R. 56.1 Stmt. Defendants do not dispute that McDougal's letter contained the words "print run of 40,000." Defs.' Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 11–12. Instead, they argue that the DC Moore invoice, which does not contain any print run limitation, confirmed the oral license that Bergt and the unidentified McDougal employee had already agreed to. It was not, therefore, an acceptance of the terms contained in the August 6 letter. *Id.* ¶ 14. Bergt did not testify to having communicated the 40,000 print run limit to DC Moore:

Q. [D]id you have any conversations with Sandy Paci about the licensing?

A. I might have warned her, or alerted her to the fact that this person would be contacting them about an interest of reproducing my work, and that they would be requesting a 4x5, yes.

. . .

Q. Tell me everything, as best you can recall, about that conversation. I think you just said you called her to say this might be coming. Did she say anything in response?

A. No. I mean generally it was like, "Okay, I'll take care of it." That was sort of her response.

Q. After [McDougal] contacted Ms. Paci, she did not call you back?

A. Right.

Bergt Dep. 86:24–87:4, 87:10–18. Bergt does allege, however, that Ms. Paci's letter "confirm[ed] Plaintiff's grant of rights to reproduce the painting that McDougal had requested." Pl.'s Mem. in Support of Mot. for Partial Summary Judgment at 3. Tak-

ing these facts together, if the oral license did not include the 40,000 print run term, DC Moore's invoice similarly could be found not to have incorporated the 40,000 term contained in the August 6 letter. Paci could have been repeating the terms of the license conveyed to her by Bergt, instead of responding directly to McDougal's August 6 letter and accepting its terms. If, however, the oral license is found to include the 40,000 print run term, defendants would be hard-pressed in establishing the fact that the invoice did not implicitly include the limitation.

As the court cannot conclude at this stage in the proceedings whether the oral license was limited in scope, defendants' reliance on the invoice's lack of mention of a print run limitation similarly cannot be disregarded. The issue of whether reproduction of the painting was limited in scope to 40,000 copies based on the exchange of letters remains in dispute.[5] Bergt has failed to establish conclusively that the license he granted McDougal, either oral or written, was limited in scope. Consequently, summary judgment on the issue of defendants' liability for copyright infringement will be denied.[6]

## II. McDougal's Motion for Partial Summary Judgment

### A. Bergt's Fraud Claim

McDougal seeks summary judgment on Bergt's state law claim for fraud. McDou-gal bases its motion on several theories: (1) there is no genuine issue of material fact as to Bergt's alleged reliance, McDougal's knowledge that the misrepresentation was false, and damages due to the fraud; (2) Bergt's fraud claim is preempted by the Copyright Act; and (3) Bergt's fraud claim is time-barred.

■■■ Under Illinois law, to establish fraud, a plaintiff must show "(1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hefferman v. Bd. of Trs. of Ill. Cmty. Coll. Dist. 508*, 310 F.3d 522, 525 (7th Cir.2002) (citation omitted) (internal quotation marks omitted). A plaintiff must prove the elements of fraud by clear and convincing evidence. *See Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008) (collecting Illinois fraud cases).

Bergt's amended complaint specifically alleges that, in its August 6, 1988 letter to DC Moore, McDougal falsely represented that it sought to use the painting in the textbook for a print run of 40,000, when it knew at the time that its actual use would greatly exceed that number. The amended complaint further alleges that McDougal intended to induce Bergt to accept the

---

5. This finding is in accord with the District of Colorado's ruling in a related case. *See Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F.Supp.2d 1230, 1239–40 (D.Colo.2008) ("The invoices [plaintiff] issued for those licenses contain no limiting language as to scope; however, [plaintiff] alleges, based on the language in [defendant's] request letters, that these licenses, too, were limited in scope to reproduction of 40,000 copies.... The Court finds that this issue is in dispute and cannot be resolved in this summary judgment proceeding." (internal citations omitted)).

6. Defendants devote much of their Response to arguing that, if the license were to be found to include the 40,000 print run term, industry standard dictated that that term was "a boilerplate industry marker that signaled a request for a license for a single edition of a 'basal' textbook." Defs.' Resp. to Pl.'s Mot. for Partial Summary Judgment at 8. The court does not reach this argument because summary judgment is inappropriate on the basis of disagreement over the existence of a limited license.

$200 proposed fee by its misrepresentation, thus obtaining a license for the painting at a lower cost than it otherwise would have paid if it had dealt honestly with Bergt. According to the amended complaint, Bergt relied on this misrepresentation in granting McDougal a license for the fee proposed. This court found these allegations to be sufficient to state a claim for fraud. *Bergt*, 2006 WL 3782919, at *4.

McDougal argues that, with discovery complete, Bergt cannot demonstrate by clear and convincing evidence the required elements of fraud based on any alleged statement in the August 6, 1998 letter. Specifically, McDougal focuses on Bergt's inability to demonstrate McDougal's state of mind in making the misrepresentation, Bergt's reliance on the truth of the statement, and damages resulting from Bergt's reliance. Bergt, however, responds to McDougal's motion with a new theory of fraud. He alleges that, during the telephone conversation Bergt had with an unidentified McDougal employee before August 6, 1998, McDougal made a false statement with respect to the intended print run, intending to induce Bergt's reliance, and that Bergt in fact relied on this statement in agreeing to the $200 fee. Pl.'s Resp. to McDougal's L.R. 56.1 Stmt. ¶ 1–10. The facts needed to establish this claim surfaced at Bergt's deposition, during which, as discussed in Section II.A, Bergt testified inconsistently as to whether the conversation included limiting use of the painting to a print run of 40,000.

■ Bergt's new attempt to base his fraud claim on the conversation he had with an unidentified McDougal employee fails. Allegations of fraud are subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). This means that Bergt must be able to aver the "who, what, when, where, and

how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). While his recollection of the conversation may be specific enough to establish an oral contract, Bergt cannot meet the heightened standards required to make out a fraud claim. He has not specifically identified the McDougal employee with whom he had the conversation or when the conversation took place. *See* Pl.'s Resp. to McDougal's L.R. 56.1 Stmt. ¶ 1 ("In 1998, Plaintiff received a phone call from a McDougal employee. . . .") Bergt did, however, meet the Rule 9(b) requirement for fraud with respect to the August 6, 1998 letter. *Bergt*, 2006 WL 3782919, at *4. As a result, this court will consider whether summary judgment is appropriate based on the particulars pleaded in the amended complaint.

■ With regard to the framework alleged in the amended complaint, McDougal has established, and Bergt has not countered, that Bergt could not have justifiably relied on the August 6, 1998 letter in deciding to grant McDougal a license for $200. Bergt did not see the August 6, 1998 letter containing the representation that McDougal would use the image for a print run of 40,000 until after litigation in this case had begun. Pl.'s Resp. to McDougal's L.R. 56.1 Stmt. ¶ 41 ("Plaintiff admits he did not receive license documents from DC Moore Gallery and did not see McDougal's request letter August 6, 1998 until it was produced in litigation. . . ."); Bergt Dep. 86:18–23 ("Q. Did DC Moore send you copies of the invoice? / A. No, they didn't. / Q. Did DC Moore send you copies of any other correspondence between them and McDougal Littell? / A. No, they didn't."); *id.* at 88:15–89:21 ("Q. The first time you saw [the letter was] in preparation for the litigation here? / A. That's correct. / Q. Did you see it at the time in 1998? / A. I did

not."); *id.* at 117:1–11. He also did not recall having any conversations with Paci between August 6 and August 11, the date on which Paci sent McDougal an invoice with the transparency of the painting. *Id.* at 87:16–18 ("Q. After [McDougal] contacted Ms. Paci, she did not call you back? / A. Right."); *id.* at 91:25–92:3; *id.* at 118:1–4 ("Q. Do you recall, did you have a conversation with Ms. Paci between August 6 and August 11? / A. I don't recall one.").

Even viewing the facts in a light most favorable to Bergt, his admission to not seeing the August 6, 1998 letter until years after the license was given establishes that Bergt could not have relied on the 40,000 print run term in agreeing to the licensing fee. No genuine issue of fact remains with respect to Bergt's reliance on the statement. Even assuming the other elements for fraud are met, Bergt's claim fails because he cannot establish this essential element of a fraud claim. Thus, summary judgment is appropriate on Bergt's fraud claim and McDougal's motion will be granted.[6]

## B. Bergt's Request for Punitive Damages

██ In his amended complaint, Bergt seeks punitive damages against McDougal. Punitive damages are not available in copyright infringement suits. *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 931 (7th Cir.2003); 4–14 Nimmer on Copyright § 14.02[C][2] ("The cases are clear that exemplary or punitive damages should not be awarded in a statutory copyright infringement action."). Thus, Bergt would be entitled to recover punitive damages only if he prevailed on his fraud claim. As McDougal's motion for summary judgment on Bergt's fraud claim has been granted, this form of recovery is foreclosed. Ac-

cordingly, McDougal's motion for summary judgment on Bergt's request for punitive damages will be granted.

## C. Bergt's Request for Disgorgement of McDougal's Profits

17 U.S.C. § 504(b) allows a copyright owner to recover, in addition to actual damages, any profits of the infringer attributable to the infringement and not accounted for in the computation of actual damages. In determining the infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Read literally, this section appears to require only that a plaintiff prove the defendant's gross revenue before the burden shifts to the defendant. It has been interpreted, however, to require the plaintiff to show a reasonable relationship or causal nexus between gross revenue and the infringement. *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 712 (9th Cir.2004); *On Davis v. Gap, Inc.*, 246 F.3d 152, 160 (2d Cir.2001). This showing is required regardless of whether the case is one for direct or indirect profits, although some circuits have required a more extensive showing in indirect profit cases. *See Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir.2003).

██ Direct profits are "those that are generated by selling an infringing product." *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir.2002). Direct profit cases include those where the copyrighted work is sold as a whole, *see Taylor*, 712 F.2d 1112

---

**6.** While McDougal made several additional arguments for why summary judgment should be granted in its favor on Bergt's fraud claim,

because it is undisputed that Bergt cannot prevail on the reliance element required for fraud, the court need not address them.

(finding that plaintiff could recover profits from defendant's sale of unauthorized copies of plaintiff's copyrighted maps), or where the copyrighted work is included as a part of a larger whole. *See On Davis,* 246 F.3d at 160 (using a poem in an anthology of poetry to illustrate the plaintiff's burden of providing "evidence of the revenues realized from the sale of the [product] containing the infringing [work]"); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505 (9th Cir.1985) (finding that defendant's use of several of plaintiff's copyrighted songs in a musical revue entitled plaintiff to recover a portion of the profits from the revue). By contrast, indirect profits have "a more attenuated nexus to the infringement." *Mackie,* 296 F.3d at 914. Indirect profit cases generally are those where "the infringers did not sell the copyrighted work, but used the copyrighted work to sell another product." *Andreas,* 336 F.3d at 796. In *Mackie,* the infringed work formed part of a brochure used to promote the sale of season tickets to the symphony. *Mackie,* 296 F.3d at 912. The plaintiff sought to recover the symphony's profits from that season. *Id.* at 913. In *Andreas,* the plaintiff sought to recover Audi's revenue from sales of the TT coupe, where Audi had used the copyrighted work in a television commercial for that car. *Andreas,* 336 F.3d at 791–92.

Bergt's request for disgorgement of profits is one for direct profits. While McDougal attempts to characterize this case as one for indirect profits because Bergt cannot demonstrate that the textbook was purchased solely because the painting was included in it, this is not the proper test for distinguishing between direct and indirect profits. Instead, the court must determine whether the profits derived from the sale of a product contain-

ing the copyrighted work or from the use of the copyrighted work to promote sales of another product. Here, the painting was not used separately in an attempt to promote the sale of the textbook, but instead forms an integrated component of the textbook. As such, this case is more comparable to the infringing use of a poem in an anthology, *On Davis,* 246 F.3d at 160, and copyrighted songs as part of a larger musical revue, *Frank Music Corp.,* 772 F.2d 505, than the infringing use of copyrighted text or images to promote the sale of a car, *Andreas,* 336 F.3d 789, or season tickets for the symphony. *Mackie,* 296 F.3d 909.

■ The Seventh Circuit has required only a minimal connection between revenue and infringement in direct profit cases. *Taylor,* 712 F.2d at 1122.[7] In *Taylor,* it found that "all [§ 504(b)] means is that [plaintiff] could have made out a prima facie case for an award of infringer's profits by showing [defendant's] gross revenues from the sale of the infringing [product]. It was not enough to show [defendant's] gross revenues from the sale of everything he sold...." *Id.* Thus, all a plaintiff must do to meet his burden in the Seventh Circuit is provide a figure limited to the profit stream resulting from the infringement. Requiring the plaintiff to show more would be contrary to § 504(b)'s intent and would confuse the parties' respective burdens. *See Bonner v. Dawson,* 404 F.3d 290, 294 (4th Cir.2005) ("Here, the profits at issue are not generated by outside sources, but by money collected from the use of the specific infringed work. To require [plaintiff] to show more of a connection than this in order to satisfy his burden would be to effectively eliminate the burden-shifting provision of § 504(b)

---

7. Because this is a direct profit case, the court does not address the extent of the plaintiff's

burden in an indirect profit case.

and place the entire burden on the copyright holder."); *Andreas*, 336 F.3d at 796 ("The burden of establishing that profits are attributable to the infringed work often gets confused with the burden of apportioning profits between various factors contributing to the profits."). Consequently, as the Seventh Circuit has required only a minimal showing of a causal nexus in a direct profit case to meet the plaintiff's § 504(b) burden, Bergt only need establish McDougal's gross revenue from sales of the textbook.[8]

▬▬▬ Bergt has undisputedly done so. McDougal's Resp. to Pl.'s L.R. 56.1 Addl. Stmt. ¶ 22. Thus, summary judgment is only appropriate if no genuine issue of material fact exists as to what portion of McDougal's gross revenue is attributable to factors other than the use of the painting in the textbook. McDougal claims that no reasonable jury could conclude that the revenue generated from the sale of the textbook is in any way attributable to the painting. McDougal's Mem. in Supp. of Mot. for Partial Summary Judgment at 17, hereinafter McDougal Mem. It marshals as evidence the fact that the painting comprises only one of the approximately 1250 pages of the textbook and less than a page of the teacher's edition. McDougal's L.R. 56.1 Stmt. ¶¶ 49–50. As the textbook's focus is language, not visual, arts, McDougal uses expert testimony to demonstrate that the inclusion of the painting could not have formed the basis for the decision to buy the textbook.

McDougal Mem. at 17–18. McDougal's expert on textbook selection, Dr. Don Hooper, stated that he has "never known an instance where anyone made a decision to select a textbook based upon a particular photograph, illustration, or even a particular collection of photographs." Ex. 16 to McDougal's L.R. 56.1 Stmt. at ¶ 8. Bergt's retained expert on the subject, Mr. Lance Fuhrer, testified that his "experience has shown that one single image has never chosen one book or another." Ex. 18 to McDougal's L.R. 56.1 Stmt. at 109:24–110:1, hereinafter "Fuhrer Dep." The decision to exclude the painting from the e-edition of the textbook allegedly further demonstrates the "low independent value of images to language arts programs" and that the painting itself was a "fungible element" of the textbook. McDougal Mem. at 19.

Bergt disputes McDougal's claims, providing evidence from which a reasonable jury could find that the inclusion of the painting in the textbook, when viewed in conjunction with other elements of the textbook, played a role, however minimal, in generating revenue for McDougal. Despite stating that no one image has been the deciding factor in textbook selection in his experience, Mr. Fuhrer noted that "photographs, images, illustrations are a basis for a selection process, they're one of several things that . . . would be a basis for selection." Fuhrer Dep. 109:7–10. He stated:

8. Bergt's failure to present a buyer whose decision to buy the textbook was made solely on the inclusion of the painting is immaterial in both direct and indirect profit cases to initially establish McDougal's gross revenue. *See Semerdjian v. McDougal Littell*, No. 07 Civ. 7496(LMM), 2009 WL 1834507 (S.D.N.Y. June 22, 2009) ("[E]ven in indirect profits cases, not all courts require proof that the infringing use caused consumers to buy." (citing *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 715 (9th Cir.2004))); *Wood*, 589 F.Supp.2d at 1245 ("[E]stablishing a causal nexus does *not* require the plaintiff 'to put a . . . buyer on the stand to testify that she bought' the product at issue specifically *because* of the infringement." (quoting *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 797 (8th Cir.2003))). The inability to produce such evidence, however, does bear on the apportionment of gross revenue between the inclusion of the painting and other factors.

To suggest, as Dr. Hooper has, that images are not an essential part of both the selection of textbooks and the creation of them is contradictory to the evidence. State standards address the value and importance of visuals, making them a part of both State Goals and Performance Descriptors (which are used to assess student achievement). Empirical research makes clear connections between visuals and both short- and long-term understanding. Textbook selection committees with whom I've served and led consistently produce dialogue and debate focused on the strengths and weaknesses of the visuals in one textbook versus another.

Ex. 1 to Pl.'s Resp. to McDougal's L.R. 56.1 Stmt. at ¶ 11. McDougal's Rule 30(b)(6) representative, Mr. Donald Lankiewicz, stated that selling a book without images "would put [McDougal] at a competitive disadvantage since [its] competitors would be more highly illustrated." Ex. 6 to Pl.'s L.R. 56.1 Addl. Stmt. at 171:21–172:6. Fantasia, the McDougal employee who sent the August 6, 1998 letter to DC Moore, testified that "[t]here was a heavy emphasis on fine art" (into which category Fantasia placed the painting) in choosing images for the textbook, as "teaching of art history" was a desired part of the textbook program. Ex. 3 to Pl.'s L.R. 56.1 Addl. Stmt. at 14:20–15:6, 29:7–20. McDougal's contention that the painting added no value to the textbook is undermined by the fact that the painting formed the basis of a mini-lesson in the teacher's handbook. Ex. 14 to McDougal's L.R. 56.1 Stmt. Further, if the painting added no value to the textbook, McDougal would not have paid the $200 licensing fee for its use. This evidence, taken as a whole, creates a genuine issue of material fact with regard to the apportionment of McDougal's gross revenue due to the use of Bergt's painting in the textbook and other factors.

Because apportionment is a highly fact-specific inquiry, *Andreas,* 336 F.3d at 798, and McDougal has not presented uncontroverted evidence that none of the revenue it received from the sale of the textbook was due to the use of Bergt's painting, the determination of profits attributable to the alleged infringement should be left to the jury. Accordingly, McDougal's motion for summary judgment on Bergt's request for disgorgement of profits will be denied.

### III. Donnelley's Motion for Partial Summary Judgment on Bergt's Request for Disgorgement of Donnelley's Profits[9]

■ Like McDougal, Donnelley argues that the causal nexus required in order for Bergt to recover any portion of its profits is missing. Donnelley incorporates McDougal's arguments and facts on the issue in support of its motion. Donnelley further argues that no causal nexus exists because it "did not participate in the selection, or arrangement, of the materials included in [the textbook]," "was not aware of anything regarding the licenses used to acquire the materials in [the textbook]," "did not sell or market [the textbook]," and earned profits "solely on the invoices McDougal paid, and not from purchasers of [the textbook]." Donnelley's Mem. in Supp. of Mot. for Partial Summary Judgment at 2, hereinafter "Donnelley Mem."

---

**9.** Donnelley's motion involves the same standards as those set out in Section II.C. Bergt has the burden of establishing that a causal nexus exists between the alleged infringing activity, the printing of the textbook containing the painting more times than licensed, and Donnelley's revenue stream from the printing. If that burden is met, Donnelley then must come forward with evidence related to the attribution of the revenue in order to determine what portion is attributable to the infringement.

None of this, however, changes the fact that Donnelley can be held liable in its own right for reproducing the copyrighted painting. 17 U.S.C. § 106(1); *see Respect Inc. v. Fremgen,* 897 F.Supp. 361, 363 (N.D.Ill.1995) ("[T]he nexus between the owner of the copyright and the printer of infringing copies arises when the infringements are produced. The moment [the printer] printed he became liable to plaintiff." (internal quotation marks omitted)). No exception exists in § 504(b) for infringers who, like Donnelley, have not participated in selecting the copyrighted work for inclusion in the printed product or were not aware of the publisher's licensing arrangement. While the fact that Donnelley was not actively involved in the licensing process bears on the attribution issue, it does not negate the undisputed fact that Donnelley profited from the printing of the textbooks containing the painting, the relevant inquiry in determining whether a causal nexus exists. *See Wood v. Houghton Mifflin Harcourt Pub. Co.,* 589 F.Supp.2d 1230, 1249 (D.Colo.2008).

■ As with McDougal's revenue derived from infringement, Bergt has established a causal nexus between Donnelley's printing of the textbook that contained his painting and the revenue Donnelley earned from printing the textbook. The evidence as to Donnelley's gross revenue derived from printing the textbook is uncontroverted. Donnelley's Resp. to Pl.'s L.R. 56.1 Addl. Stmt. ¶ 1. It does not make a difference that the revenue came from printing charges that McDougal paid in connection with the textbook. The causal nexus between the revenue and the inclusion of the painting in the textbook is established by the fact that the revenue derives from the printing itself, and not the distribution of the textbook. Thus, Bergt has met his burden under § 504(b), leaving Donnelley to demonstrate that all of its revenue is attributable to factors besides the inclusion of the painting in the textbook for sum-

mary judgment to be granted in its favor. Donnelley has failed to do so here. In addition to the evidence cited by McDougal in support of its motion for partial summary judgment on this issue, *see supra* Section II.C, Donnelley alleges that it would have earned the same revenue whether the textbook included the image or not because its revenue came from invoices paid by McDougal and not from purchasers of the textbook. Donnelley Mem. at 2–3. Donnelley, however, does not explain how orders were placed, instead noting that Bergt "has not adduced any evidence regarding the ordering procedures McDougal employed, and therefore there is no evidence regarding when McDougal placed orders with Donnelley in relation to actual sales." *Id.* at 3. This assertion is not enough to establish that Donnelley's profits were in no way due to the inclusion of the painting in the textbook, as § 504(b) places the burden on Donnelley, and not Bergt, to present evidence to establish apportionment. Bergt has presented sufficient evidence, as discussed in Section II.C, to create a genuine issue of material fact as to the apportionment of profits between the inclusion of the painting in the textbook and other factors, such as McDougal's ordering procedures. Consequently, Donnelley's motion for summary judgment on Bergt's request for disgorgement of profits will be denied.

### CONCLUSION AND ORDER

For the foregoing reasons, Bergt's motion for partial summary judgment against defendants for copyright infringement [# 70] is denied. McDougal's motion for partial summary judgment on Bergt's fraud claim and request for punitive damages [# 71] is granted. McDougal's motion for partial summary judgment on Bergt's request for disgorgement of McDougal's profits [# 71] is denied. Don-

nelley's motion for partial summary judgment on Bergt's request for disgorgement of Donnelley's profits [# 75] is denied.

This case will be called for a status hearing on October 8, 2009 at 9:30 a.m. The parties are instructed to engage in a sincere effort to resolve this litigation and to report on these efforts at the status hearing.